**H–M WEXFORD LLC, Plaintiff,**

v.

**ENCORP, INC., Steven Ballentine, Joseph J. Iannucci, Jesse E. Neyman, Dennis A. Orwig, William D. Patterson, George Schreck and Jeffrey W. Whitham, Defendants.**

**C.A. No. 19849.**

Court of Chancery of Delaware,
New Castle County.

Submitted: Jan. 30, 2003.
Decided: May 27, 2003.

---

53. *Waller v. J.E. Brenneman Co.,* 307 A.2d 550, 553 (Del.Super.1973).

54. Asset Purchase Agreement § 10.1.

55. *See* note 10, *supra.*

Michael Hanrahan, Paul A. Fioravanti, Jr., Prickett, Jones & Elliott, Wilmington, Delaware, for Plaintiff.

Raymond J. DiCamillo, Srinivas M. Raju, Lisa M. Zwally, Richards, Layton & Finger, Wilmington, Delaware; Tarek F.M. Saad, Morrison & Foester LLP, Denver, Colorado, for Defendants Encorp, Inc., Steven Ballentine, Joseph J. Iannucci, Jesse E. Neyman, Dennis A. Orwig, William D. Patterson and George Schreck.

Edward M. McNally, Elizabeth A. Brown, Morris, James, Hitchens & Williams LLP, Wilmington, Delaware, for Defendant Jeffrey W. Whitham.

## OPINION

LAMB, Vice Chancellor.

### I.

An investor who bought securities as part of a larger private placement is suing

the issuer and the issuer's former CEO, making claims that information it received in connection with that transaction was materially misleading. The plaintiff is also asserting claims against the issuer and its board of directors arising out of the issuer's later efforts to reach a settlement with the plaintiff and the others who invested in the private placement. The plaintiff refused the issuer's proposal to issue additional securities in exchange for a release, but nearly all of the other investors agreed to this proposal and exchanged releases for additional shares of stock. The plaintiff alleges that the structure and effect of this settlement was coercive and discriminatory as to it. In addition, the plaintiff complains that the issuer did not comply fully with the provisions of Section 228 of the Delaware General Corporation Law when it solicited the stockholder written consents necessary to effectuate the terms of the settlement proposal.

In this opinion, the court grants a motion made by most of the defendants to dismiss the misrepresentation claims insofar as they relate to information furnished to the plaintiff that was not incorporated into the fully integrated written agreement by which it purchased the shares. The court will not dismiss other claims for misrepresentation that relate to information referred to or warranted by the purchase agreement. The court also dismisses the claims of unfairness or breach of fiduciary duty alleged with respect to the settlement transaction, as the allegations of the complaint fail to overcome the normal presumption of the business judgment rule. Finally, the court concludes that the complaint adequately alleges a failure to comply with the technical requirements of Section 228.

## II.

### A. The Parties

#### 1. The Plaintiff[1]

Plaintiff H–M Wexford, LLC is a Delaware limited liability company with its principal place of business in Greenwich, Connecticut. Wexford is in the business of making investments, and represents itself as an "accredited investor" as defined under the federal securities regulations.

#### 2. The Defendants

##### a. Encorp And Its Executives

Defendant Encorp, Inc. is a Delaware corporation with its principal place of business in Windsor, Colorado. The company provides products, services and solutions to commercial and industrial customers with respect to on-site power systems. Defendant Jeffrey Whitham founded Encorp in 1993 and until recently served as the company's President, CEO and Chairman of the board of directors.[2] Defendant Dennis Orwig has been the President and CEO of Encorp since February 19, 2002. On or about July 26, 2002, Orwig purportedly became a director of Encorp.

##### b. The Board Of Directors

There are five members of Encorp's board of directors, all of whom are defendants in this case. They are Steven Ballentine, Joseph Iannucci, Jesse Neyman,

---

1. For purposes of this motion, the following facts are taken from the well-pleaded allegations in the complaint and documents submitted therewith.

2. Defendant Whitham has not joined the other defendants in their motion to dismiss this action, and has instead filed an answer to the complaint on his own behalf. However, it appears that the reasoning in this opinion would apply equally to Whitham, so, unless Wexford objects, the ruling on this motion will apply to all defendants.

William Patterson, and George Schreck (collectively, the "Board of Directors"). Ballentine has been a director of Encorp since February 2001, and is a managing member of Ballentine Capital Partners Fund, L.P. Iannucci has been a director of Encorp since December 1997. Neyman is director of Encorp, and is affiliated with AES Holdings, L.P. Patterson has been a director of Encorp since January 1998, and is President of Enstar Management Corporation. Schreck has been a director of Encorp since July 1997. He is Vice President of Pacificorp Energy Services, Inc., and owns 5,000 shares of Encorp Series A preferred stock.

### B. *The February 2001 Offering*

#### 1. *The Series D Offering And The Purchase Agreement*

On or about February 9, 2001, Wexford and a number of other persons (collectively, the "Purchasers") entered into a Stock and Warrant Purchase Agreement (the "Purchase Agreement") with Encorp for the purchase of certain Encorp stock and warrants (the "February 2001 Offering"). Defendant Whitham signed the Purchase Agreement on behalf of Encorp. The Purchase Agreement provided for Delaware law to govern the transaction.

On or about February 9, 2001, Wexford paid $1,999,800 to Encorp in exchange for 909 units of Encorp stock and warrants (the "Units"), pursuant to the Purchase Agreement. Each Unit that Wexford purchased consisted of one share of Encorp's Series D Convertible Preferred Stock (the "Series D Stock") and one warrant to purchase a share of Series D Stock. An automatic conversion of the warrants later occurred, and, as a result, the Units purchased by Wexford currently consist of 1,808 shares of Series D Stock.[3]

In Section 3.05 of the Purchase Agreement, Encorp stated that it had delivered to the Purchasers the company's unaudited balance sheet as of September 30, 2000, as well as audited balance sheets as of December 31, 1998 and December 31, 1999. Encorp also provided statements of operations, stockholders equity, and cash flows for those periods (collectively, the "Company Financial Statements"). All of these documents were provided to the Purchasers before the execution of the Purchase Agreement.

In Section 3.05 of the Purchase Agreement, Encorp represented that the Company Financial Statements presented the financial position of Encorp fairly, except where adjusted by notes or schedules. Encorp also represented in Section 3.14 and 3.18 thereof that all books and records were complete and correct and, since the date of the latest balance sheet, there was no material adverse change in its financial condition, contractual arrangements, or any other event or condition that would have a material adverse effect on Encorp's business.

#### 2. *The Private Placement Memorandum*

Before it signed the Purchase Agreement, Wexford received a copy of a Private Placement Memorandum ("PPM") dated January 11, 2001. The PPM included audited financial information for the year ending December 31, 1999, and unaudited financial information for the eleven-month period ending November 30, 2000. Additionally, the PPM contained projections for the years ending December 31, 2001 and December 31, 2002. The project-

---

**3.** The complaint states only that an automatic conversion took place, and that now Wexford's holdings consisted of 1,808 shares.

Compl. ¶ 17. However, it appears that if all 909 warrants were converted, Wexford would now own 1,818 Series D shares.

ed figures in the PPM indicated that the sales for the twelve-month period ending December 31, 2000 would be $10.7 million, with a 31% gross margin of $3.3 million. The actual sales for the twelve months ending December 31, 2000 were $9.6 million, and Encorp only had an 11% gross margin of $1.1 million. There also were significant differences in the projections for the year ending December 31, 2001 and the actual results.[4]

The complaint alleges that, before the Purchase Agreement was executed, Encorp and Whitham knew about Encorp's actual sales revenues, and the corresponding gross margins for December 2000 and January 2001, and knew the results for the year ending December 31, 2000. The defendants also allegedly knew that Encorp had lost a significant customer. After the closing, the complaint alleges, Wexford realized that Encorp's financial condition was significantly worse than had been represented in the PPM.

### C. The Settlement Proposals And Related Transactions

#### 1. The May 17 Proposal

On or about May 17, 2002, Wexford received a package of documents that set forth the terms of a proposal by Encorp to effectively reprice the Series D Stock (the "May 17 Proposal"). The proposal was an attempt by Encorp, the Board of Directors, and Orwig to resolve informal complaints from Purchasers relating to the February 2001 Offering, and Encorp's ensuing poor financial performance. The documents show that the Board of Directors and Orwig approved the May 17 Proposal. Under the May 17 Proposal, Encorp proposed to issue a sufficient number of additional shares of the Series D

Stock in order to effectively reprice the February 2001 Offering at $625 per share.

The May 17 Proposal contemplated that, as part of the transaction, Encorp would grant each Purchaser additional Series D Stock in exchange for a release from any and all claims and obligations related to the February 2001 Offering. The release applied to Encorp, as well as its past and present directors and officers (except Whitham) and Encorp's affiliates and agents. In addition, it was contemplated that Encorp would also grant releases in favor of its directors. Iannucci, Patterson and Schreck constituted a majority of Encorp's directors both at the time of the February 2001 Offering and at the time of the May 17 Proposal and, therefore, allegedly would have benefited from these releases. In his letter to the Purchasers, Orwig stated that the board strongly recommended the May 17 Proposal, but he did not disclose the apparent potential benefit that any such release may have afforded the directors.

The terms of the May 17 Proposal required that Purchasers holding at least 98% of the Series D Stock approve and participate in the settlement. If that condition were satisfied, then all Purchasers would receive additional shares of Series D Stock, pro rata, regardless of whether or not they approved and participated in the settlement. Wexford told Encorp that it was not interested in participating in the proposal. Because Wexford holds more than 2% of the Series D Stock, its refusal to participate "killed" the May 17 Proposal.

#### 2. The June 7 Proposal

On or about June 7, 2002, Encorp issued a second proposal (the "June 7 Pro-

posal") in a further effort to settle the dispute about the Series D Stock. Like the first proposal, the June 7 Proposal was approved by the Board of Directors and Orwig. Unlike the May 17 Proposal, however, the June 7 Proposal required participation by only 80% of the Series D shareholders. In a letter accompanying the June 7 Proposal, Orwig explained that the terms of the proposed settlement were revised because Wexford refused to accept the May 17 Proposal. By reducing the required percentage of participating Purchasers, Encorp obviated the need to gain Wexford's agreement in order to settle with the other Purchasers.

Under the June 7 Proposal, the Purchasers who participated in the settlement would receive additional shares of Series D Stock. Those who did not accept the Proposal would not receive additional shares; rather, they would retain their shares and whatever claim they had with regard to the February 2001 Offering. The June 7 Proposal also contemplated several amendments to Encorp's certificate of incorporation that were necessary to affect the transaction. Among other things, these amendments permitted the issuance of additional shares of Series D stock to those Purchasers who agreed to accept the Proposal without implicating preemptive rights of other Purchasers. In addition, the number of authorized shares of Series D Stock was increased from 40,500 to 75,000.

Defendants Ballentine, Neyman and Patterson were members of the Encorp Board of Directors which approved the June 7 Proposal. Each is affiliated with, or represents the interests of, Purchasers who chose to participate in the June 7 Proposal. The June 7 Proposal also required that those who participated in the settlement provide Encorp, its past and present directors and officers (except Whitham), and its affiliates and agents with a release from any and all claims related to the February 2001 Offering.

Defendant Orwig sent a letter dated June 7, 2002 to the Series D shareholders. The letter stated that the board strongly recommended the Series D shareholders approve the June 7 Proposal. It also notified those shareholders that, upon receipt of the revised settlement agreement included with the June 7 Proposal executed by at least 80% of the Series D shareholders, Encorp would send out a form of stockholder consent to all stockholders of the company to approve the Fourth Restated Certificate, and the amendment to the Fourth Amended and Restated Stockholder Agreement. The letter further represented that Encorp would file the Fourth Restated Certificate and distribute the additional Series D Shares to the Purchasers that executed the settlement agreement. Wexford notified Encorp of its objection to the June 7 Proposal, and its intention not to participate in the transactions contemplated therein, by letter dated June 14, 2002.

### 3. The Notice And Consent

On July 26, 2002, Encorp filed with the Delaware Secretary of State the Fourth Restated Certificate. On July 31, 2002, Orwig sent an e-mail to Wexford stating that the Series D repricing had been completed with 94% of the Series D shareholders consenting to the action. The Whitham family and Wexford were the only parties that did not consent. Sometime thereafter, Wexford received a Notice of Stockholder Action of Encorp, Inc. (the "Notice"). The Notice stated that Encorp stockholders had approved the actions and agreements necessary to consummate the June 7 Proposal. The Notice indicated that the items that were approved included the Fourth Restated Certificate, the ap-

pointment of Orwig and Philip J. Deutch to the board of directors and the amendment of Encorp's bylaws.

The Written Consent of Certain Stockholders of Encorp, Inc. (the "Consent") was attached as Exhibit A to the Notice. The Consent reflects that all of the parties executed the written consent as of June 19, 2002. It does not appear to reflect the date when the Consent was executed by any particular stockholder. Correspondence between Orwig, Wexford and other parties supports the inference that the execution date was not actually June 19, 2002.

In addition to the certificate amendments and other transactions, the Consent also represented an approval of a particular voting agreement (the "Voting Agreement"). The Voting Agreement requires that certain holders of Series D Stock that are affiliated with a particular director cause that director to vote in a specified manner on matters brought before the Encorp board.

### III.

Wexford filed its complaint against the defendants on August 19, 2002. The complaint makes claims that the defendants breached the terms of the original Purchase Agreement, and committed fraud against Wexford and the other Purchasers. The complaint also alleges that the defendants' efforts to reprice the Series D Stock through settlement have compromised the value of Wexford's stake in Encorp.

The focus of Wexford's complaint is twofold. First, it alleges that the financial information provided by Encorp (particularly in the PPM) was materially misleading. Wexford claims that Encorp represented in the Purchase Agreement that it was in better financial condition than it actually was, and that these representations caused Wexford to purchase shares of the Series D Stock. Second, Wexford alleges that the June 7 Proposal represents an attempt by the defendants to force Wexford to agree to the terms of settlement (i.e., the repricing of the Series D Stock issued in the February 2001 Offering). It claims that the June 7 Proposal was issued in response to Wexford's rejection of the May 17 Proposal, in order to discriminate against Wexford in the event that it did not settle. Wexford contends that the defendant members of the Board of Directors who approved the transaction were not disinterested, and that the implementation of the June 7 Proposal and the related transactions benefited the defendants at Wexford's expense.

Count I of the complaint alleges fraudulent inducement by Encorp, its Board of Directors and its then CEO Whitham. Specifically, Wexford claims that it was fraudulently induced into purchasing the Series D Stock. Count II of the complaint alleges equitable fraud against the same defendants. Count III alleges negligent misrepresentation by the defendants and Whitham with regard to the inaccuracy of the information that they provided to Wexford. Count IV alleges a breach of contract by Encorp with regard to the Purchase Agreement entered into by Wexford in relation to the February 2001 Offering. With regard to Counts I through IV, Wexford seeks rescission of the Purchase Agreement, requiring Encorp to return the entire sum Wexford paid for the Units it purchased in the February 2001 Offering—or, in the alternative, an award of damages—plus interest, attorneys fees, and costs.

Count V alleges that there was no proper stockholder approval of the June 7 Proposal because the date on which each stockholder signed the Consent was not properly recorded and the transactions as-

sociated with the June 7 Proposal (the Fourth Restated Certificate and other actions approved by the Consent) are therefore invalid. Wexford asks the court to declare invalid the transactions executed pursuant to the June 7 Proposal, and award equitable relief in the form of rescission and cancellation, or damages, plus interest, attorneys' fees, and reasonable cost of suit.

Count VI alleges a breach of fiduciary duty by the director defendants and Orwig. Specifically, Wexford charges that the defendants breached their fiduciary duty of loyalty to Wexford because of inherent conflicts of interest with respect to the June 7 Proposal and the transactions implemented in connection therewith. Wexford seeks damages, interest, attorneys' fees and reasonable costs of suit.

### IV.

 When considering a motion to dismiss a complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the court is to assume the truthfulness of all well-pleaded allegations of fact in the complaint.[5] Although "all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true ... neither inferences nor conclusions of fact unsupported by allegations of specific facts ... are accepted as true."[6] That is, "[a] trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in Plaintiffs' favor unless they are reasonable inferences."[7] Additionally, the court may consider, for certain limited purposes, the content of documents that are integral to or are incorporated by reference into the complaint.[8] Under Rule 12(b)(6), a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations.[9]

### V.

A. *Claims Relating To The February 2001 Offering*

Wexford's claims regarding the February 2001 Offering rest on two basic contentions. First, Wexford claims that the representations made in the PPM, and particularly the accompanying financial statements, were materially misleading. Second, Wexford alleges that the defendants knew that Encorp had suffered an adverse change in financial condition and had lost one of its largest customers, but concealed those facts in order to enhance the appearance of the company's financial position before the execution of the Purchase Agreement. Based on these allegations, Wexford argues that the defendants breached the Purchase Agreement and perpetrated a fraud. Wexford has also alleged negligent misrepresentation against the defendants. While the legal standards used to evaluate breach of con-

---

5. *Grobow v. Perot*, 539 A.2d 180, 187 & n. 6 (Del.1988).

6. *Id.*

7. *Id.*

8. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69–70 (Del.1995).

9. *See In re Wheelabrator Tech's, Inc. S'holders Litig.*, 1992 WL 212595, at *3 (Del.Ch. Sept.1, 1992) ("the Court is hardly bound to accept as true a demonstrable mischaracterization and the erroneous allegations that flow from it"); *see also Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del.2001) ("a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law").

tract and fraud claims are quite different, the operative facts that give rise to Wexford's claims are the same. Therefore, the court will examine these claims concurrently.

### 1. *Claims Related To The PPM And Attached Financial Statements*

The defendants have moved to dismiss Wexford's claims for breach of contract and fraud (with regard to the ostensibly misleading financial statements) essentially for the same reason. They argue that the PPM cannot serve as a basis for Wexford's claims because it is excluded from the parties' agreement by the integration clause in Section 9.15 of the Purchase Agreement. Therefore, the defendants reason, there could not have been any contractual obligation with regard to the PPM, and thus none could be breached. Likewise, the defendants suggest that, in light of the exclusionary provisions of Section 9.15, Wexford's reliance on the PPM is not justifiable, and therefore the fraud claims based on the PPM must also fail as a matter of law.

The court agrees with the defendants' assessment of these claims, and will therefore dismiss Wexford's breach of contract and fraud claims as they relate to the PPM.

### a. *Breach Of Contract Claims Relating To The PPM*

 Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a

resulting damage to the plaintiff.[10] Here, the Purchase Agreement does not give rise to any contractual obligation predicated on the financial information set forth in the PPM. On the contrary, it is clear from the Purchase Agreement, that Encorp agreed to warrant a different set of financial information, defined in the Purchase Agreement. Thus, its contractual liability will be limited to the warranted financials.

The thrust of Wexford's claim for breach of the Purchase Agreement relates to the Encorp financial statements that were included with the PPM but not in the Purchase Agreement. Specifically, the complaint alleges that the actual and projected Encorp financial information furnished in the PPM to Wexford and relied upon by it, were materially inaccurate and misleading. It then alleges that the deficiencies in the information provided in the PPM constitute a breach of the obligations created by the representations and warranties made in the Purchase Agreement.

In asserting this claim, Wexford relies on Section 3.26 of the Purchase Agreement,[11] which is entitled *Disclosure* and reads in pertinent part:

> Neither this Agreement nor any other document, certificate or written statement delivered or required to be delivered by [Encorp] to each of the Purchasers *under this Agreement*, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein not mislead-

---

10. *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1995 WL 662685, at *7 (Del.Ch. Nov.2, 1995).

11. With regard to its claims arising from misleading information, Wexford also points to Section 6.01 of the Purchase Agreement, in which Encorp agreed to indemnify the Pur-

chasers against any and all losses arising from a breach by Encorp, including inaccuracies in representations made under the Purchase Agreement. However, this provision is inapplicable to the PPM for the same reasons as Section 3.26 is inapplicable.

ing.[12]

At oral argument, the plaintiff's counsel suggested that the phrase "under this Agreement" modifies the term "Purchaser" in this Section.[13] But the term "Purchaser" is itself defined in the Purchase Agreement and means a purchaser under the Purchase Agreement. Thus, to read the phrase "under this Agreement" as modifying "Purchaser" would obviously render the phrase meaninglessly redundant and surplusage. To avoid this result, the court reads that phrase as modifying the phrase "delivered or required to be delivered." So construed, it is clear that the warranty of accuracy of information provided by Encorp applies only to documents, certificates or other written statements "delivered or required to be delivered" pursuant to the Purchase Agreement. The PPM was not "delivered or required to be delivered" to Wexford "under" any provision of the Purchase Agreement; therefore, the financial information found in it does not fall within the scope of the warranty in Section 3.26.

This conclusion is supported by reference to the comprehensive integration clause found in Section 9.15 of the Purchase Agreement. Section 9.15 is entitled *Entire Agreement,* and reads:

> This Agreement, including documents, Schedules, instruments and agreements referred to herein, and the agreements and documents executed contemporaneously herewith embody the entire agreement and understanding of the parties hereto in respect to the subject matter hereof. There are no restrictions, promises, representations, warranties, covenants, or undertakings, other than those *expressly set forth or referred to herein* or therein. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.[14]

The defendants argue correctly that the effect of this clause is to exclude from the Purchase Agreement any representation or warranty not expressly set forth or referred to therein. The PPM is not expressly referred to anywhere in the Purchase Agreement. Therefore, it cannot serve as a basis for a claim that the defendants breached the Purchase Agreement.

Wexford argues that because the Purchase Agreement and the PPM both contain financial statements, the PPM was "referred to" in the Purchase Agreement within the meaning of the integration clause. This argument is unpersuasive for two reasons. First, the financial statements provided with the Purchase Agreement did not cover the same time periods as the financial documents included with the PPM.[15] Second, the clear intent of the parties was that the defendants should warrant only the accuracy of the financial statements as of the period ending September 30, 2000, which were delivered pursuant to the Purchase Agreement. If the parties had agreed that the defendants should warrant the unaudited financials statements through November 30, 2000, which were included in the PPM, they could easily have done so. They did not. This confirms that the PPM and the infor-

---

12. Corrected Hanrahan Aff. Ex. A ("Purchase Agreement") at 20 (emphasis added).

13. Tr. of Oral Argument on Defs.' Mot. to Dismiss at 48.

14. Purchase Agreement at 29 (emphasis added).

15. The financial statements included with the Purchase Agreement represented the company's financial position as of September 30, 2000. Purchase Agreement at 10. The financial statements included with the PPM represented the company's position as of November 30, 2000. PPM at 4.

mation delivered therewith cannot serve as a basis for a breach of contract claim. Accordingly, the court will grant the defendants' motion to dismiss with respect to Wexford's breach of contract claims arising from the PPM.

b. *Fraud And Negligent Misrepresentation Claims Relating To The PPM*

■ In general terms, Wexford alleges that the defendants knowingly or negligently misrepresented Encorp's financial position, both in the PPM and in the Purchase Agreement. More specifically, Wexford asserts that the financial statements and projections initially provided by the defendants as attachments to the PPM were misleading. It alleges that the results of operations reflected in those financial statements are misleading because the defendants accelerated profits from the first quarter of 2001 into the fourth quarter of 2000 in order to boost Encorp's fourth quarter and year-end numbers before the February 2001 Offering.

As previously discussed, however, the PPM is not a document delivered under the Purchase Agreement. In fact, no projections were delivered under the Purchase Agreement, and it is not alleged that the Company Financial Statements delivered pursuant to the Purchase Agreement omitted any material facts, or were otherwise inaccurate.

■ Even if the PPM were considered for purposes of the misrepresentation claims, the financial information and projections section of the PPM contains an explicit disclaimer regarding the projections printed in bold type, stating that the projections had not been reviewed and no assurances were given with regard to the projections, and, furthermore, the projections should be read in conjunction with the enumerated risk factors and schedules discussing the projections attached thereto.[16]

Moreover, in the Purchase Agreement, Wexford represented itself as an "accredited investor" as defined by federal securities regulations.[17] As such, Wexford presumptively understood the ramifications of the integration clause in the Purchase Agreement and the disclaimer clause in the PPM. Wexford cannot now profess ignorance with respect to these clauses, and state that it justifiably relied on the information in the PPM when it entered into the Purchase Agreement. To say this differently, if Wexford wanted to be able to rely upon the PPM or particular facts represented therein, it had an obligation to negotiate to have those matters included within the scope of the integration clause of the contract.[18]

■ Justifiable reliance is an element of common law fraud,[19] equitable fraud,[20] and negligent misrepresentation[21] under Delaware law. Because Wexford cannot claim

---

16. PPM at 4.

17. *See* 17 C.F.R. § 230.501(a)(defining "Accredited Investor").

18. The Court of Chancery has consistently held that sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract. *Great Lakes Chemical Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555–56 (Del.Ch.2001).

19. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983); *Harman v. Masoneilan Inc.*, 442 A.2d 487, 499 (Del.1982).

20. *Zirn v. VLI Corp.*, 681 A.2d 1050, 1061 (Del.1996).

21. *Glosser v. Cellcor, Inc.*, 1994 WL 593929, at *22 (Del.Ch. Oct. 17, 1994).

that it justifiably relied on the information in the PPM, these claims must fail as a matter of law. Therefore, the court will grant the defendants' motion to dismiss the misrepresentation claims with respect to the information contained in the PPM.

### 2. Claims Unrelated To The PPM

In addition to the allegations stemming from the PPM, Wexford has advanced independent claims for breach of contract, fraud and negligent misrepresentation. It alleges that the defendants knew that Encorp had sustained an adverse change in its financial condition and lost one of its major customers before the execution of the Purchase Agreement. Wexford further claims that the defendants intentionally withheld this information so as not to discourage potential participants in the February 2001 Offering. It argues that, in failing to disclose this information, the defendants willfully breached representations and warranties in the Purchase Agreement, and fraudulently induced Wexford to participate in the February 2001 Offering.

### a. Breach Of Contract Claims Unrelated To The PPM

█ With regard to its claim for breach of contract independent of the PPM, Wexford refers to Section 3.18 of the Purchase Agreement. Section 3.18 is entitled *Absence of Certain Changes* and reads in pertinent part:

Since the Balance Sheet Date, there has not been:

(a) any adverse change in the assets, liabilities, financial condition or operat-

ing results of [Encorp] ... except changes in the ordinary course of business that have not had, or will not have, in the aggregate, a Material Adverse Effect.

(m) any other event or condition of any character that might materially and adversely affect the assets, properties, financial condition, operating results or business of [Encorp].[22]

The Balance Sheet Date is defined in Section 3.05 of the Purchase Agreement as September 30, 2000.[23] The Purchase Agreement was executed on February 9, 2001.[24] Wexford contends that the defendants falsely represented that there were no events that materially adversely affected Encorp between these dates.

Wexford alleges that the defendants knew that there had been an adverse change in the financial condition of Encorp at the time of the closing because they possessed the financial statements for the year ending December 31, 2000 and month ending January 31, 2001–both of which showed such a change. Moreover, Wexford maintains that the defendants knew that Encorp had lost one of its major customers (*i.e.* Elektryon), and that such a loss would have a Material Adverse Effect on Encorp's operations.[25] Wexford argues that the defendants breached the Purchase Agreement by representing that there had been no such change or effect, and that, as a result of this breach it suffered damages.

The defendants counter Wexford's claim by asserting that Wexford had full opportunity to investigate Encorp and inquire about any matters that it deemed neces-

---

22. Purchase Agreement at 18–19.

23. Purchase Agreement at 10.

24. Compl. ¶ 11.

25. Material Adverse Effect is defined in Article I, Subsection (a) of the Purchase Agree-

ment as "any material adverse change in the condition (financial or otherwise), business, operations, properties, prospects, assets, or liabilities of [Encorp]." Purchase Agreement at 5.

sary.[26] They contend that as an "accredited, sophisticated investor[ ] [Wexford] would know what to request." [27] The defendants point out that Wexford does not allege any failure to provide financial information that it requested, and therefore, it has not stated a claim. This argument falls short.

If Wexford's allegations are accepted as true, then it could show that there was a material adverse change in Encorp's financial position between the Balance Sheet Date and the date the Purchase Agreement was executed. The defendants, in Section 3.18, represented that there was no such change. By alleging facts that show a contractual obligation on the part of the defendants, a breach of that obligation, and damages to itself as a result of that breach,[28] Wexford has stated a claim for breach of contract irrespective of the PPM. Therefore, the defendants' motion to dismiss Wexford's breach of contract claim on these grounds will be denied.

b. *Fraud Claims Unrelated To The PPM*

■■■■ Wexford's fraud claim, like its breach of contract claim, rests on the defendants' purported failure to disclose the

adverse changes in Encorp's position before the execution of the Purchase Agreement. Wexford also contends that statements in the Purchase Agreement, taken together, amount to a negligent misrepresentation. For the reasons next discussed, the court will deny the defendants' motion to dismiss with respect to these claims.

■■■■■■ Common law fraud in Delaware requires: 1) the existence of a false representation, usually one of fact, made by the defendant; 2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; 3) the defendant had the intent to induce the plaintiff to act or refrain from acting; 4) the plaintiff acted or did not act in justifiable reliance on the representation; and 5) the plaintiff suffered damages as a result of such reliance.[29] In addition to overt representations, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.[30] To state a claim for equitable fraud under Delaware law, a plaintiff must "satisfy all the elements of common-law fraud with the exception that plaintiff need not demonstrate that the misstatement or omission was made knowingly or reckless-

---

26. The defendants rely specifically on Section 4.04 of the Purchase Agreement, in which Wexford represented that, throughout the negotiation of the transactions, it had been given "(i) full and free access to corporate books, financial statements, records, contracts, documents, and other information concerning the Company and to its offices and facilities; (ii) an opportunity to ask such questions of the Company's officers and employees concerning the Company's business, operations, financial condition, assets, liabilities and other relevant matters as they have deemed necessary or desirable; and (iii) all such information as has been requested, in order to evaluate the merits and risks of the prospective investment contemplated herein." Purchase Agreement at 21.

27. Defs.' Opening Br. in Supp. of Mot. to Dismiss at 11.

28. The defendants have also claimed that Wexford has not adequately pleaded damages for the purported breach, however, based on the facts that Wexford has alleged, it can reasonably be inferred that, if those facts are true, Wexford suffered damages in the form of an overpayment for its investment in Encorp.

29. *Stephenson,* 462 A.2d at 1074; *Harman,* 442 A.2d at 499.

30. *Stephenson,* 462 A.2d at 1074.

ly." [31]

■ Wexford has alleged that representations in Sections 3.18 and 3.26 of the Purchase Agreement (among others) were false when made.[32] It alleges that the defendants either knew or should have known at the time that the claims were false or misleading. According to Wexford, the defendants intended to induce Wexford to enter into the Purchase Agreement by making these false representations. Wexford also alleges that it justifiably relied on the representations in deciding to enter into the Purchase Agreement, and suffered damages as a result. Based on these assertions, the defendants have alleged all of the elements of common law fraud.[33]

■ The defendants argue that Wexford has failed to plead any of the elements of fraud with the particularity required to satisfy Court of Chancery Rule 9(b). Under Rule 9(b), the circumstances that must be stated with particularity are the time, place, and contents of the false representation, the identity of the person(s) making the representation, and what he intended to obtain thereby.[34] Essentially, to satisfy that requirement, the plaintiff must allege circumstances suffi-

cient to fairly apprise the defendant of the basis for the claim.[35]

■ The defendants contend that Wexford's allegations regarding false statements are made on information and belief, and are therefore not particular enough to state a claim. They make the same contentions with respect to Wexford's allegations about their state of mind (*i.e.* their knowledge about the accuracy of the representations, and their intent in making those representations). In support of these contentions, the defendants rely largely on *York Linings v. Roach.*[36] *York Linings*, however, is factually dissimilar, and the defendants' reliance on this case is misplaced.

In *York Linings*, the court dismissed fraud claims where the complaining party had not even alleged that the representations were false when made, or that the party making the representations knew they were false. Here, Wexford has alleged that the representations in Section 3.18 were false when made, and that the defendants (*i.e.* Encorp, Whitham and the Encorp Board) knew the representations were false. Wexford alleges that the defendants withheld this information so that Wexford would not be dissuaded from participating in the February 2001 Offering.

---

**31.** *Zirn,* 681 A.2d at 1061.

**32.** It is established that "one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading." *Stephenson,* 462 A.2d at 1074. Therefore, it appears that Wexford could show the defendants perpetrated a fraud by failing to disclose the material adverse change even absent an actual false representation.

**33.** As noted above, equitable fraud bears the same elements as common law fraud, with the exception that equitable fraud does not require knowledge on the part of the defendants that the representation was false. Be-

cause equitable fraud encompasses a lesser burden, Wexford has necessarily alleged the elements of equitable fraud as well.

**34.** *Autrey v. Chemtrust Indus. Corp.,* 362 F.Supp. 1085, 1092–93 (D.Del.1973); *Nutt v. A.C. & S., Inc.,* 466 A.2d 18, 23 (Del.Super.1983).

**35.** *Norman v. Paco Pharm. Servs., Inc.,* 1989 WL 110648, at *10 (Del.Ch. Sept.22, 1989); *Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. Hunt Int'l Res. Corp.,* 1987 WL 55826, at *6 (Del.Ch. Feb. 27, 1987).

**36.** 1999 WL 608850, at *3 (Del.Ch. July 28, 1999).

Here, the only allegations Wexford makes on information and belief are with regard to the knowledge and intent of the parties. The *York Linings* court itself noted that Rule 9(b) provides "that malice, intent, knowledge and other condition of mind of a person necessary to plead fraud may be averred generally."[37] Furthermore, courts have recognized in similar contexts that the particularity requirement must be applied in light of the facts of the case, and less particularity is required when the facts lie more in the knowledge of the opposing party than of the pleading party.[38] Accordingly, the court is unpersuaded by the defendants' arguments that Wexford failed to allege with particularity either a false representation or the requisite knowledge and intent on the part of the defendants.

The defendants contend that Wexford has not adequately alleged justifiable reliance at all, much less with particularity. They suggest that the risk disclosures included with the Purchase Agreement preclude justifiable reliance on the representations in the Purchase Agreement. The court disagrees.

Schedule 4.04 was attached to the Purchase Agreement and delineated various risks that might be associated with an investment in Encorp. Among the risks addressed was the possibility that Encorp *"may not* achieve profitability"[39] and "operating results *may* fluctuate significant-ly."[40] Schedule 4.04 also stated that, "[o]ur customers *may* cancel or delay their purchases of our products, which could adversely affect our business."[41]

These risk disclosures address events that could foreseeably happen after the February 2001 Offering is consummated. They do not speak to events, of which the defendants were allegedly already aware, that happened between the Balance Sheet Date and the date the Purchase Agreement was executed. Nor do the disclosures obviate the affirmative representations in the Purchase Agreement that there had been no material adverse change between the Balance Sheet Date and the closing date.[42] Therefore, the risk disclosures in Schedule 4.04 cannot be said to preclude Wexford's justifiable reliance.

The defendants' claim that Wexford has not alleged justifiable reliance with particularity is also unpersuasive. Wexford has specifically alleged that it relied on the defendants' ostensibly false representations in the Purchase Agreement in deciding to participate in the February 2001 Offering. Likewise, the court is unconvinced that Wexford has not adequately alleged damages. Wexford has alleged that it suffered damages because of its decision to participate in the February 2001 Offering, which was based on the false representations made by the defendants. This allegation is stated with

---

37. *Id.* at *2; *see also* 2A *Moore's Federal Practice* ¶ 9.03 (the requirement that fraud be stated with particularity does not require particularization of allegations of fraudulent intent).

38. *Carello v. PricewaterhouseCoopers*, 2002 WL 1454111, at *8 (Del.Super. July 3, 2002).

39. Raju Aff. ("Purchase Agreement") Schedule 4.04–1 (emphasis added).

40. Purchase Agreement Schedule 4.04–2 (emphasis added).

41. Purchase Agreement Schedule 4.04–8 (emphasis added).

42. It should also be noted that these risk disclosures do not eliminate the defendants' duty to disclose information in order to prevent previous statements from becoming misleading. Therefore, in order to avoid a fraud on these grounds, the defendants may still have been required to disclose this information.

enough particularity to satisfy the requirements of Rule 9(b).[43]

The complaint identifies the time, place, and contents of the false representations, the identity of the defendants, and what they intended to obtain, as required by Rule 9(b). Wexford's complaint has fairly apprised the defendants of the basis for the fraud claim, and has thus adequately stated a claim for fraud. The court finds no merit in the defendants' arguments that the risk disclosures attached to the Purchase Agreement precluded justifiable reliance on affirmative representations in the Purchase Agreement. The court also finds that Wexford has stated a claim for negligent misrepresentation by alleging the necessary elements.[44] Therefore, the court will deny defendants' motion to dismiss Wexford's fraud and negligent misrepresentation claims that are independent of the PPM.

## B. Claims Relating To The June 7 Proposal And Subsequent Settlement

In addition to its claims regarding the February 2001 Offering, Wexford has alleged claims for breach of fiduciary duty as a result of the transactions associated with the June 7 Proposal. Specifically, it charges that the defendants "had serious conflicts of interest with respect to the June 7 Proposal"[45] and breached their fiduciary duty to Wexford "in their initiation, structuring, approval and implementation of the June 7 Proposal and related transactions."[46] Wexford also claims that the Consent and the Voting Agreement are invalid. The defendants have moved to dismiss each of these claims.

The court will grant the motion to dismiss with respect to the claims for breach of fiduciary duty and the validity of the Voting Agreement, and deny the motion to dismiss with respect to the claim that the stockholder consent is invalid.

### 1. Fiduciary Duty Claims

Wexford claims that the individual defendants breached their fiduciary duties by approving and implementing the settlement on the terms contemplated by the June 7 Proposal. In essence, Wexford argues that the June 7 Proposal, although made on the same terms to all Series D stockholders, discriminated against it because it had disapproved the May 17 Proposal. Wexford suggests that the "changes reflected in the June 7 Proposal [from the May 17 Proposal], were a part of a discriminatory effort to coerce Wexford into accepting the terms that the Encorp Defendants wanted."[47] Specifically, it argues that the provisions that grant additional shares only to those Series D holders who chose to participate in the settlement (the "Additional Share Provisions") are unfair, and that the defendants violated their fiduciary duties in adopting them.

---

**43.** See *Marhart, Inc. v. CalMat Co.*, 1992 WL 82365, at *4.

**44.** Negligent misrepresentation requires: 1) a particular duty to provide accurate information, based on the plaintiffs pecuniary interest in that information; 2) the supplying of false information; 3) failure to exercise reasonable care in obtaining or communicating information; and 4) a pecuniary loss caused by justifiable reliance on the false information. *Glosser*, 1994 WL 593929, at *22. The defendants' only challenge to Wexford's negligent misrepresentation claim was that Wexford had failed to allege justifiable reliance. As was discussed above, the court finds that argument unpersuasive.

**45.** Compl. ¶ 90.

**46.** Compl. ¶ 91.

**47.** Pl.'s Ans. Br. at 29.

Wexford's claims that the June 7 Proposal was "discriminatory" or "coercive," although framed in familiar terms, do not withstand analysis. Moreover, because Wexford has not adequately alleged that the directors were interested in the transactions related to the June 7 Proposal, the protections of the business judgment rule apply to the Board's decisions on the matter. For these reasons, Wexford's claims for breach of fiduciary duty fail as a matter of law and will be dismissed.

### a. Business Judgment Rule Applies To The Decisions Regarding The June 7 Proposal

■ Under Delaware law, decisions made by the board of directors on behalf of the corporation are ordinarily protected by the business judgment rule.[48] The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." [49] Under this rule, the court will not substitute its own notions of sound business judgment for that of the board, unless the presumption is rebutted.[50]

■ To begin the analysis, it is clear from the facts alleged in the complaint that the June 7 Proposal served a valid business purpose of seeking to resolve a dispute between Encorp and the Purchasers. Moreover, Wexford does not challenge the basic economic terms of the June 7 Proposal. For example, it does not allege that Encorp received inadequate

consideration for the additional shares of Series D Stock that it issued. On the contrary, Wexford's rejection of the June 7 Proposal supports a clear inference that it thought the terms of that proposal were unduly favorable to Encorp and that it would rather litigate than settle its claims on those terms.

Instead, Wexford's complaint focuses on the fact that, after Wexford torpedoed the May 17 Proposal, the Board of Directors restructured the proposed settlement to provide benefits only to those Purchasers who actually agreed to settle. It is this aspect of the June 7 Proposal that Wexford labels as "discriminatory" and "coercive." At first, Encorp planned to issue additional shares of Series D Stock to all Purchasers and proposed to limit the "free rider" problem by conditioning its willingness to effectuate the transaction on the participation of Purchasers holding at least 98% of the Series D Stock. Obviously, the Board of Directors made a judgment that, so long as it obtained such a high level of participation, it was prepared to live with the possibility that some Purchaser might both receive additional shares and refuse to release its claim. It was only when Wexford rejected the May 17 Proposal that the Board of Directors reset that acceptance at 80%. In conjunction with that decision, the Board of Directors decided that it should only issue additional shares of Series D Stock to those who agreed to the settlement terms.[51]

Wexford also seeks to avoid the application of the business judgment rule by al-

**48.** *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984).

**49.** *Id.*

**50.** *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971).

**51.** If the additional Series D Stock was issued even to those who did not provide Encorp with a release, as Wexford suggests they should have been, the benefit of settlement would have accrued even to non-settlers, thereby reducing the incentive for anyone to settle.

leging that a majority of the Board had an interest in the June 7 Proposal.[52] Wexford has alleged two grounds on which it claims the Board was not disinterested when it effected the June 7 Proposal. First, Wexford posits that the releases Board members received constituted a material benefit to the directors that made the settlement a self-interested transaction. Second, Wexford claims that several of the directors that approved the June 7 Proposal are "affiliated with, or represent the interests of, Series D shareholders who are participating in such proposal."[53] It suggests that these shareholders benefited from the dilution that befell the non-participating Series D shareholders, including Wexford. Neither argument comes up to the mark.

Encorp's Board of Directors during the time when the June 7 Proposal was implemented consisted of Ballentine, Iannucci, Neyman, Patterson and Schreck. Of these five directors, only Iannucci, Schreck and Patterson were also directors at the time of the February 2001 Offering. Wexford claims that these directors had an interest in the June 7 Proposal because they received a release from any liability they may have incurred as a result of the February 2001 Offering. Wexford argues that the liability exposure eliminated by the releases was substantial and thus the interest was material to the directors. In making these arguments, Wexford ignores settled Delaware law.

Delaware courts recognized that, except in egregious circumstances, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors."[54] The threat of liability in the instant case is not an egregious circumstance that would warrant exceptional treatment. The complaint fails to allege that anyone had sued, or even threatened suit against, the directors at the time they authorized either settlement proposal. Indeed, even Wexford's complaint does not allege claims with respect to the February 2001 Offering against any director other than Whitham. Wexford's complaint does not even allege facts that, if true, would support any such claim. The only claims against the other directors relate to the settlement itself.[55]

Because the threat of personal liability was so insubstantial, there is no force to Wexford's contention that, because the Settlement Agreement includes releases running in favor of the directors, those directors were "interested" in that transaction. In addition, it is more or less universally the case that when a corporation pays value to settle a claim, it demands and receives releases in favor of its directors, officers and other agents, in order to preclude the possibility of having to defend against any additional claims arising out of the matters at issue in the settlement. There would be little sense in a rule providing that the presence of such prophylactic measures in a settlement agreement

---

52. *Orman v. Cullman,* 794 A.2d 5, 22 (Del.Ch. 2002); *Solomon v. Armstrong,* 747 A.2d 1098, 1111–12 (Del.Ch.1999).

53. Compl. ¶ 50.

54. *Aronson,* 473 A.2d at 815; *Malpiede,* 780 A.2d at 1085.

55. When pressed at oral argument, Wexford's counsel agreed that the thrust of the claims

related to the sale of the securities was directed at the corporation, not the Board of Directors. Tr. of Oral Argument on Defs.' Mot. to Dismiss at 62–63. Wexford's counsel also conceded that there was no claim against any of the directors relating to the February 2001 Offering pending in any court at the time of the settlement. *Id.* at 64.

results in that agreement being treated as an interested party transaction.

Wexford's arguments with regard to the other "pecuniary" interests of the directors in the settlement are equally untenable. Wexford alleges that Patterson, Neyman and Ballentine, through affiliations with holders of Series D Stock, benefited from the Additional Share Provisions in the June 7 Proposal. Wexford also alleges that Ballentine received the right to appoint a board member as a result of the June 7 Proposal. This right, however, had already been granted to Ballentine as part of the original Purchase Agreement.[56] The central problem with the former allegation is that the June 7 Proposal was made on the same terms to all holders of Series D Stock. Had all Purchasers accepted that offer, a non-pro rata distribution of shares would not have occurred and no "benefit" would have resulted from the Additional Shares Provisions. Wexford's decision not to participate cannot, as a matter of law, taint with self-interest the Board of Directors' decision to authorize the June 7 Proposal and to effectuate the settlement on the terms proposed therein.

█ Additionally, in order to rebut the business judgment rule presumption, an interest must be subjectively material to the director.[57] In other words, the alleged benefit must be significant enough as to make it improbable that the director could perform his fiduciary duties to the shareholders.[58] Wexford has failed to allege how the benefits it alleges were subjectively material to any of these directors. It argues only that "the Court must consider all of the various benefits received by the directors and their affiliates"[59] and states in a conclusory fashion that "[i]n the aggregate, these benefits are material."[60] Without more, Wexford has not alleged enough to suggest that the Board could not perform its fiduciary duties to shareholders.

Because Wexford cannot show that a majority of the Encorp Board was interested in the transactions associated with the June 7 Proposal and the Settlement Agreement contemplated therein, the Board's decision on the matter is protected by the business judgment rule. As discussed at the outset of this section, the Encorp Board clearly had a rational business purpose (i.e. the settlement of the majority of disputes regarding the February 2001 Offering) when it consummated the June 7 Proposal. Therefore, as a matter of law, the court must refrain from disturbing the Board's decision on the matter. Accordingly, Wexford's claims for breach of fiduciary duty will be dismissed.

b. *Wexford's Claims Of Discrimination And Coercion Are Without Merit*

█ Woven into Wexford's claim for breach of fiduciary duty are assertions that the actions taken in order to effect the June 7 Proposal were discriminatory and coercive in nature. These claims have no merit, and do nothing to support its claim for breach of fiduciary duty.

█ Wexford's contention that it has been the victim of discrimination is insupportable as a matter of law. The transaction itself did not discriminate among the Series D stockholders. Instead, the settlement offer was made to all holders of

---

56. *See* Purchase Agreement at 29.

57. *Solomon,* 747 A.2d at 1118; *Orman,* 794 A.2d at 23.

58. *Id.*

59. Pl.'s Ans. Br. at 33.

60. *Id.*

Series D stock. Each then had to choose whether to retain the right to litigate, or accept additional Series D Stock in exchange for that right. Some Purchasers chose to settle. Wexford chose to litigate.[61] Having made that choice, Wexford can hardly complain that the fact that others chose differently impacts its rights as a stockholder of Encorp. It is well established that, under Delaware law, "stockholders need not always be treated equally for all purposes." [62] The disparate treatment that Wexford suffered as a result of its own decision is neither inequitable nor unfair.[63]

██ Wexford also mistakenly labels the June 7 Proposal as inequitably coercive. "Impermissible coercion exists 'where the board . . . takes actions which have the effect of causing the stockholders to [act favorably toward a] proposed transaction for some reason other than the merits of the transaction.' " [64] The problem with Wexford's argument is that it does not allege that the other stockholders were strong-armed into accepting the settlement or approving the June 7 Proposal. On the contrary, the complaint fails to allege that the other Series D stockholders agreed to participate in the Settlement Agreement for any reason other than agreement with the merits of that proposal. At the same time, Wexford attempts to allege inequitable coercion as to it, notwithstanding the fact that it refused to participate in the Settlement Agreement–and, thus, was conclusively not coerced.

61. By choosing to retain the right to litigate, Wexford implicitly represented that it believed that right was more valuable than the additional Series D Stock.

62. *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del.1993).

63. *Applebaum v. Avaya*, 812 A.2d 880, 886 (Del.2002) (finding that disparate treatment

For the foregoing reasons, the court concludes that Wexford's claims regarding the allegedly discriminatory or coercive effect of the June 7 Proposal fail to state a claim for breach of fiduciary duty and must be dismissed.

### 2. *Validity Of The Consents And Voting Agreement*

Wexford claims that both the Consents and the Voting Agreement implemented in connection with the June 7 Proposal are invalid. The defendants have moved pursuant to Rule 12(b)(6) to dismiss Wexford's claim that the Consents are invalid. For the reasons discussed below, the court will deny defendants' motion with respect to the Consents, and grant the motion with respect to the Voting Agreement.

### a. *The Consents*

██ Wexford's claim that the Consents are invalid is based on 8 *Del. C.* § 228(c). Section 228(c) states unequivocally that "[e]very written consent shall bear the date of signature of each stockholder or member who signs the consent." Wexford alleges that the signers neglected to date the Consents approving the transactions contemplated by the June 7 Proposal. Instead, each Consent included a pre-printed date of June 19, 2002. The defendants do not dispute that the signers did not individually date their Consents, but instead advance the strange proposition that Section 228(c) does not invalidate written consents not individually dated. They argue that Section 228(c) states that stockholder

was not forbidden where there was some rational business purpose).

64. *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 620 (Del.Ch.1999)(quoting *Williams v. Geier*, 671 A.2d 1368, 1382–83 (Del.1996)).

consent will be effective unless written consents are not delivered within sixty days. Defendants reason that, since there is no possibility that the sixty-day time limit imposed by Section 228(c) was not fulfilled, Wexford's technical dispute is of no import. This reasoning is not compelling.

First, Section 228(c) reads: "Every written consent *shall* bear...."[65] The word "shall" is a mandatory term. It denotes that such action must be taken in order to comply with the statute, and thus be valid. Second, the technical requirement of Section 228(c) is imposed in order to facilitate Section 228(c)'s sixty-day time limit for returning consents. The sixty-day time limit is measured from return of the first signed consent to the last. While it may be possible to discern whether the sixty-day requirement was fulfilled in the present case by examining extraneous factors, such is not always the case. For this reason, the date requirement set forth by Section 228(c) must be strictly enforced. Therefore, the court will not dismiss Wexford's claim that the Consents are invalid.

#### b. *The Voting Agreement*

 Wexford also claims that the Voting Agreement requires the directors appointed by the Series D stockholders to vote in a particular way on certain matters. It argues that this requirement violates 8 *Del. C.* § 141(a), and the Voting Agreement is therefore invalid. The defendants have moved to dismiss this claim pursuant to Rule 12(b)(6). For the rea-

sons subsequently discussed, the court will grant that motion.

■ Wexford's complaint does not allege any facts that amount to a violation of Section 141(a). It simply states, in a conclusory manner, that the agreements to vote in a specified manner violate Section 141(a) and the directors' fiduciary duties. These allegations are not sufficient to support a valid claim. Moreover, even if the allegations did state a claim, there is nothing improper about the Voting Agreement. The Voting Agreement was entered into between Encorp and certain Series D stockholders. No director signed the Voting Agreement in his capacity as a director of Encorp. Therefore, no director is bound by the Voting Agreement.[66] As a result, even if it were somehow unjust, the Voting Agreement cannot cause the directors to violate their fiduciary duties, or otherwise violate Section 141(a).

### VI.

For the foregoing reasons, the motion to dismiss with respect to Counts I, II, III, and IV will be **GRANTED** in part and **DENIED** in part. The motion to dismiss with respect to Count V is **GRANTED** in part and **DENIED** in part. The motion to dismiss with respect to Count VI is **GRANTED**.

---

65. *Id.* (emphasis added).

66. Wexford's counsel stipulated this fact at oral argument. Tr. of Oral Argument on Defs.' Mot. to Dismiss at 59.