# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

LM INSURANCE
CORPORATION,

        Plaintiff,

v.

WILKINSON ROOFING AND
SIDING, INC.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. N15C-07-236 PRW

Submitted: August 28, 2017
Decided: September 27, 2017

## VERDICT AFTER TRIAL

Amy D. Brown, Esquire, Margolis Edelstein, Wilmington, Delaware, Attorney for Plaintiff.

James S. Green, Sr. Esquire, Seitz, Van Ogtrop & Green P.A., Wilmington, Delaware, Attorney for Defendant.

**WALLACE, J.**

## I.    INTRODUCTION

Plaintiff Liberty Mutual Insurance Corporation ("LM") filed suit against Defendant Wilkinson Roofing and Siding, Inc. ("Wilkinson") for breach of its insurance coverage contract with LM. LM alleges that Wilkinson owes it an additional premium from the period it supplied Wilkinson with workers' compensation insurance coverage for certain jobs performed in Maryland, New Jersey, and Pennsylvania, along with jobs in Delaware where LM claims Wilkinson misrepresented the nature of its work in order to secure a lower premium from LM. Wilkinson denies it owes LM any additional premium. Wilkinson argues it had workers' compensation coverage in Maryland, New Jersey, and Pennsylvania, and therefore LM had no obligation under the terms of the policy to provide coverage in those states. Wilkinson says little of its admitted (or otherwise proven) falsification or non-documentation of its work in Delaware and other states.

After a bench trial and supplemental post-trial briefing by the parties, the Court finds that Wilkinson is liable for the extra premiums related to Wilkinson's failure to properly classify its Delaware job site employees. Too, the Court finds that Wilkinson is liable for additional premiums for out-of-state work performed by Wilkinson employees sent from Delaware.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. LM CONTRACTS TO PROVIDE WORKERS' COMPENSATION COVERAGE TO WILKINSON.

On or about August 1, 2010, LM and Wilkinson entered into an insurance policy contract known as # WC5-33S-344540-020 (the "Policy").[1] Wilkinson was not able to obtain insurance through the voluntary contracting of an Insurer, so it was placed in a high-risk pool based on the type of work it did.[2] Wilkinson was assigned to LM for insurance.[3] The Policy was to cover the period from August 1, 2010, to August 1, 2011. It stated that LM would provide workers' compensation insurance to Wilkinson, and in return, Wilkinson would pay LM for that coverage. The initial premium quoted in the Policy and paid by Wilkinson was only an estimate.[4] The final premium is calculated at the Policy's end. The Policy states that "[i]f the final premium is more than the premium paid to [LM initially], [the client] must pay [LM] the balance" when the Policy ends.[5]

---

[1]     Trial Ex. Binder at EX00015.

[2]     Tr. at 65.

[3]     Tr. at 66.

[4]     Tr. at 5–6, 108–09 ("Those payroll exposures are estimated in the beginning of the policy period so that we can develop a premium, since the premium is paid prior to the policy expiring, or ending. The auditor's job is to go out, either during that policy or after the policy expires, to obtain the actual payrolls and actual class codes that were applicable to that policy period . . . .").

[5]     Trial Ex. Binder at EX00042.

The Policy also outlined what Wilkinson had to do in order to comply with LM's initial and final premium audits.[6] It states that LM required policy-holders to "maintain appropriate records . . . to facilitate a thorough audit," and to "cooperate with [LM's] auditors . . . ."[7] The Policy also explained how LM calculated the premium after it gathered Wilkinson's information through the audits.[8]

The Delaware Workers' Compensation Ratings Bureau enumerates codes that are used to classify employees and the type of work they do.[9] Certain types of work are rated higher than others. Roofing work, for example, is rated higher than clerical office work because the risk of a roofing employee getting injured or having more serious injuries is higher than a clerical office employee.[10] "The premium that is associated with each one of [the classification codes] is calculated by the payroll that the insured would incur. . . . [T]he more payroll [the insured] ha[s], the more exposure [the insured] would have, and therefore, the more premium [the insured] would pay."[11]

---

[6]    Trial Ex. Binder at EX00025.

[7]    *Id.*

[8]    Trial Ex. Binder at EX00042–EX00043.

[9]    Tr. at 7.

[10]    *Id.*

[11]    *Id.*

In order to calculate the preliminary premium estimate, LM looks at federal quarterly payroll reports, the insured's payroll records, job contracts, and payroll by job.[12] LM takes the information from the insured and makes sure that it matches generally with what was reported for the insured's tax returns. Then, LM discusses with the insured the company's operations and work.[13]

Workers' compensation for construction companies is broken down by actual trade, due to the variety of work that comprises construction projects.[14] Instead of having one classification code apply to the entire company, each individual employee is classified in order to calculate the premium.[15] The Delaware Workers' Compensation Rating Manual (the "Rating Manual") states:

> Each distinct type of construction or erection operation at a job or location shall be assigned to the classification which specifically describes such operation provided separate payroll records are maintained for each operation. Estimated or percentage allocation of payroll is not permitted.
>
> Any such operation for which separate payroll records are not maintained shall be assigned to the highest Bureau loss cost classification which applies to the job or location where the operation is performed.

---

[12]     Tr. at 11.

[13]     Tr. at 12.

[14]     Tr. at 14.

[15]     Tr. at 14, 17–18; Trial Ex. Binder at EX00095.

A separate construction or erection classification shall not be assigned to any operation which is within the scope of another classification assigned to such a job or location which is assignable to a construction classification designated "all work to completion." All operations of the insured contractor at that job or location shall be assignable to such classification.[16]

The Policy adopted the Rating Manual structure.[17] In essence, this required Wilkinson to keep separate payroll records in order to break down its construction jobs into distinct trades. If it did not, Wilkinson would be charged the highest trade premium for *all* of its employees on that job site.

## B. LM Conducts Its Initial Audit of Wilkinson.

Shortly after LM issued Wilkinson the Policy in August 2010, it began an initial audit. LM's auditor spoke with Wilkinson employee Rachel Bleacher, who furnished the payroll and other documentation to LM for that initial audit. Upon looking through the documents, the LM auditor noted that only one roofer was listed, and all other employees purportedly did siding work.[18] During that meeting, the LM

---

[16] Trial Ex. Binder at EX00095.

[17] Trial Ex. Binder at EX00022 ("WHAT WE EXPECT FROM YOU [regarding Underwriting & Policy Issuance]: Make your agent aware of any significant changes in your operations, including payroll estimates, legal status and classification of duties, so that your policy can be updated accordingly."); *Id.* at EX00025 ("WHAT TO EXPECT FROM US [regarding Premium Auditing]: We may perform an on site audit at the beginning of your policy year to review payroll estimates and classifications. . . . WHAT WE EXPECT FROM YOU [regarding Premium Auditing]: Maintain appropriated records as required by policy terms to facilitate a thorough audit.").

[18] Tr. at 21.

auditor took written notes and recorded that Ms. Bleacher told him that Wilkinson did "mostly roofing, with very little siding work," that "[t]hey didn't do any sheet metal fabrication," and that "[a]ny carpentry work was for wood blocking."[19] When the LM auditor asked why there was only one roofer on the payroll, Ms. Bleacher had him speak with her father, Wilkinson's owner, Barry Bleacher.

Mr. Bleacher told the LM auditor that Wilkinson did have a sheet metal shop, and the employees who work in the sheet metal shop do not go to the job site.[20] He also said that Wilkinson installs siding and singles, but "they do very little roofing work."[21] Because he had now received two conflicting descriptions from the Bleachers, the LM auditor asked for Wilkinson's job contracts and invoices to verify what kind of work Wilkinson actually engaged in.[22] The Bleachers said they could supply that information, and the LM auditor left.

A few months later, the LM auditor met with Ms. Bleacher and Mr. Sciortino, an insurance agent. They informed the auditor that the invoices and job contracts were not ready. Ms. Bleacher and Mr. Sciortino informed the auditor that the

---

[19]     Tr. at 23; Trial Ex. Binder at EX00617.

[20]     Tr. at 24.

[21]     *Id.*

[22]     Tr. at 25.

majority of Wilkinson's work was sheet metal, and that the sheet metal classification should be added to their policy.

In all, the initial premium estimate was $29,912.

### C. WILKINSON PROVIDES LM WITH FAKE JOB INVOICES AND OTHER SUSPICIOUS DOCUMENTATION.

Shortly thereafter, Ms. Bleacher provided the LM auditor with Wilkinson's records. The records were meant to be a sampling of the work Wilkinson did.[23] However, the records did not look legitimate to the LM auditor. He noticed that there were discrepancies between what the contract called for, and what was actually billed for.[24] For example, one contract said it was a "contract for roofing," but only billed for "gutters and downspouts."[25] If Wilkinson only installed gutters and downspouts on a job, it would be a cheaper classification than roofing – something the LM auditor had informed Ms. Bleacher of during their prior contact. Additionally, all of the projects appeared to have the same project number.[26]

Ms. Bleacher provided the LM auditor with a second packet on April 27, 2012.[27] In it, there were a number of contracts for some of the same projects

---

[23]   Tr. at 27.

[24]   Tr. at 28.

[25]   Tr. at 28–29; Trial Ex. Binder at 00115, 00120–00122.

[26]   Tr. at 32.

[27]   Tr. at 33.

previously provided to LM. But these documents contained different substantive information. For instance, for one job, the original document that Wilkinson produced to LM stated it was for gutters and downspouts, but the April 2012 document for the same contract showed it was for roofing work.[28] LM received several more conflicting documents during pre-trial discovery.[29] This even included job contracts for jobs that never existed.[30]

Further, the original payroll reports Wilkinson provided listed only one roofer.[31] Those same reports listed a large number of employees who performed "siding work."[32] Wilkinson never provided documents that LM requested for the policy period that would properly break down what each employee did on each job site.[33]

As such, every employee who worked outside of the office in any capacity was classified as roofing, the highest available rating for each job.[34] LM informed

---

[28]     Tr. at 35–38.

[29]     Tr. at 37–40, 49–52; Trial Ex. Binder at EX00128, EX00231.

[30]     Tr. at 43–49.

[31]     Trial Ex. Binder at EX00171.

[32]     *Id.* Tr. at 42.

[33]     Tr. at 53.

[34]     Tr. at 53–54.

Wilkinson that LM would do this unless Wilkinson provided LM with the proper documentation. Wilkinson failed to do so.

### D. LM RECLASSIFIES ALL EXTERNAL WILKINSON EMPLOYEES AS ROOFERS.

After LM reclassified Wilkinson's employees as roofers, the company's premium increased.[35] LM believed that all of Wilkinson's employees were Delaware employees, and therefore LM would be liable if they were injured.[36] Originally, Wilkinson had listed employees who worked in Maryland, New Jersey, and Pennsylvania. LM excluded those employees initially, but then added them back in once it was unclear whether those Wilkinson listed as out-of-state employees were, in fact, out-of-state.[37] The only employees who were not classified as roofers were purely clerical employees and outside salespeople.[38]

After this reclassification, the premium rose from the initial estimate (based on false information) of $29,912 to $73,325. To date, Wilkinson has paid LM $39,385, leaving a balance of $33,940.[39] LM terminated the policy for non-payment on April 21, 2011.

---

[35]    Trial Ex. Binder at EX00085.

[36]    Tr. at 57.

[37]    Tr. at 58.

[38]    Tr. at 59–60.

[39]    Tr. at 68.

**E. LM FILES SUIT AGAINST WILKINSON.**

LM filed suit against Wilkinson in the Court of Common Pleas for the $33,940 balance due. At mediation for that suit, LM contended that it was owed an additional $62,399. The suit was transferred here. It is now alleged that Wilkinson owes LM $96,399, the sum of the balance due on the final audit and the additional premiums identified by LM through the Court of Common Pleas' discovery process.[40]

During the Policy period, LM paid one claim for $1,649. The employee was injured in Maryland but sought Delaware benefits, requiring LM to pay. Wilkinson's principal place of business is in Delaware, but on occasion its employees leave the state for its projects. According to LM, this makes them all Delaware employees.[41] Wilkinson disagrees that those employees should be classified as Delaware employees for work they do in other states.[42]

**F. LM'S CALCULATES ITS DAMAGES IN UNPAID PREMIUMS.**

Because LM reclassified everyone except for four clerical employees and two officers to Delaware, the premium jumped from the initial estimated $29,912 to $73,325 in the final audit.[43]

---

[40] Pl. Closing Arg. at 19 (LM "is owed additional consideration under the Contract in the amount of no less than $96,339.00").

[41] Tr. at 81, 85–87; Trial Ex. Binder at EX00769 (Tab 42).

[42] Tr. at 87.

[43] Tr. at 91.

-11-

After discovery, LM reclassified several Delaware salespersons as roofers, adding $14,905 in premiums owed for those reclassified roofers. LM also reclassified Maryland salespersons as roofers, adding $9,161 to the total premiums owed. Finally, LM added $38,333 in premiums owed on out-of-state roofing employees in Maryland, Pennsylvania and New Jersey. These additions result in the $62,399 figure LM argues that Wilkinson owes in addition to the outstanding $33,940 balance still owed on the final audit.

LM contends that Wilkinson owes premium on the out-of-state roofing work not covered by insurance in the state in which the work took place. Generally, if an individual is employed by a Delaware company and lives in Delaware, but gets hurt in another state, that employee can apply for benefits in the state where he or she worked or Delaware.[44] By industry custom, carriers "will exclude each other's [coverage] as long as they can verify that the coverage they are excluding is actually being picked up by the other."[45] Here, LM initially thought that Wilkinson had other states' coverage, but during discovery, it realized that the state payroll breakdown was not accurate – and that LM had relied on those inaccuracies when it excluded

---

[44]     Tr. at 92.

[45]     *Id.*

-12-

the Maryland, Pennsylvania, and New Jersey exposure.[46] Additionally, none of the other states' breakdowns reflect roofing work, even though all were roofing jobs.

Thus, LM posits, all that LM excluded differed from what other carriers were supposedly picking up. LM suggests, therefore, that there were large parts of the payroll that no insurers were covering. So LM had to provide coverage because all of the employees on out-of-state jobs would have to be classified as Delaware employees. That is, LM covered the risk for each employee on those out-of-state jobs. LM argues it should not have been providing that coverage without charging the premium to cover those employees.

LM first acknowledges Wilkinson did have some form of coverage in Maryland and Pennsylvania during the entire time that LM was insuring it, though not for roofers. Also, Wilkinson had coverage in New Jersey for the month of March, 2011. But Wilkinson also completed a large job in that state and didn't have coverage at the time of its performance on that job.[47] So LM says it was actually covering benefits for New Jersey prior to March 2011.[48]

---

[46]    Tr. at 93.

[47]    The New Jersey policy covered the period from March 22, 2011 to April 21, 2011. Trial Ex. Binder at EX00572. Wilkinson worked on roofing jobs in New Jersey prior to March. *Id.* at EX00636.

[48]    Tr. at 101.

-13-

According to LM, there is reason to believe that the coverage for Wilkinson employees doing out-of-state jobs was not picked up by the other states because LM was unable to verify any other coverage. LM says it would, under its customary (but voluntary) practice, have stopped charging or removed those charges once it could verify any out-of-state coverage. But LM never could, because Wilkinson never provided it with proper records.[49] LM alleges it "[has]n't been provided with accurate records that have an accurate breakdown with the state, which is why [LM] included everyone under the Delaware class code, since they were all Delaware employees and those wages had not been picked up by the other states. Until a time when [LM has] accurate records so that [it] can properly break down payroll by state and by classification . . . which [LM] still [does]n't have . . . the records [will] appear as all roofing."[50]

To the best of Wilkinson's understanding, it was legally required to have workers' compensation insurance in any state where it worked.[51] Failure to do so might provide an employer an undue competitive advantage based on different

---

[49]     Tr. at 102.

[50]     Tr. at 151.

[51]     Tr. at 163.

states' insurance rates; that could then translate to a foreign contractor's bidding advantage on a job.[52]

Wilkinson claims it would sometimes hire workers from other states when it performed work in other states.[53] If so, it might need Delaware coverage for those particular workers. But Wilkinson still provides no records supporting that assertion.

Wilkinson says it had a Maryland workers' compensation policy with IWIF with a policy period from August 1, 2010, to August 1, 2011.[54] It says it had a workers' compensation policy in Pennsylvania with a policy period from August 4, 2010, to April 21, 2011.[55] It also says it had a workers' compensation policy in New Jersey with a policy period from March 22, 2011, to April 21, 2011.[56] All three of these policies were cancelled on or around the same time as the LM policy in April 2011 because Wilkinson obtained one policy that covered all of the states.[57]

---

[52]     Tr. at 164.

[53]     Tr. at 165.

[54]     Tr. at 166–67; Trial Ex. Binder at EX00567.

[55]     Tr. at 168; Trial Ex. Binder at EX00564.

[56]     Tr. at 169; Trial Ex. Binder at EX00572.

[57]     Tr. at 170.

## III. DISCUSSION

### A. THE LEGAL STANDARDS APPLIED TO ARRIVE AT A VERDICT.

Here, LM brought suit against Wilkinson for breach of contract, alleging that Wilkinson breached its obligations to pay the required premium for workers' compensation insurance because it failed to maintain accurate payroll breakdowns, which would have allowed LM to definitively calculate the premium due. Under Delaware law, a party claiming breach of contract must prove three elements: (1) the existence of a contractual obligation, express or implied; (2) a breach of that obligation; and (3) resulting damages to the complaining party.[58] Delaware follows the "'objective' theory of contracts, *i.e.* contract construction should be that which would be understood by an objective, reasonable third party."[59] "When interpreting a contract, '[c]lear and unambiguous language . . . should be given its ordinary and usual meaning.'"[60]

---

[58] *Laugelle v. Bell Helicopter Textron, Inc.*, 2014 WL 2699880, at *13 (Del. Super. Ct. June 11, 2014) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003); *Spanish Tiles, Ltd. v. Hensey*, 2005 WL 3981740, at *3 (Del. Super. Ct. March 30, 2005)).

[59] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal citation omitted).

[60] *Laugelle*, 2014 WL 2699880, at *11 (quoting *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) (internal citation omitted)).

LM must prove the existence of the three elements of its breach-of-contract claim, and the amount of any damages therefrom, by a preponderance of the evidence.[61]

### B. WILKINSON BREACHED ITS CONTRACT WITH LM REGARDING PROPER CLASSIFICATION OF WILKINSON'S EMPLOYEES AND OWES ADDITIONAL PREMIUM FOR ITS ROOFERS.

Neither Wilkinson nor LM disputes there was a valid contract (the "Policy") for workers' compensation insurance coverage. What is disputed is whether there remains any unpaid premium due to LM.

The Policy states that Wilkinson was to expect that LM might perform an audit at the beginning of the policy period and review the payroll estimates and classifications.[62] It also states that LM expected Wilkinson to "maintain appropriate records as required by [the Policy's] terms to facilitate a thorough audit."[63] The Policy goes on to explain how LM calculates premium. It says that "[a]ll premium for this policy will be determined by our manuals of . . . classifications," and that "classifications [are] assigned based on an estimate of the exposures [Wilkinson] would have during the policy period."[64] If Wilkinson did not properly estimate its

---

[61] See DEL. P.J.I. CIV. § 19.20 (Breach of Contract); *Id.* at § 4.1 (Burden of Proof – Preponderance of Evidence); *Id.* at § 22.24 (Measure of Damages – Breach of Contract) (2000).

[62] Trial Ex. Binder at EX00025.

[63] Trial Ex. Binder at EX00025.

[64] Trial Ex. Binder at EX00042–EX00043.

exposure, LM would "assign proper classifications, rates, and premium basis by endorsements to [the Policy]."[65]

The Rating Manual, which LM followed for this Policy, states that for construction-related work, "[e]ach distinct type of construction or erection operation at a job or location shall be assigned to the classification which specifically describes such operation provided separate payroll records are maintained for each operation. Estimated or percentage allocation of payroll is not permitted."[66] Further, "[a]ny such operation for which separate payroll records are not maintained shall be assigned to the highest bureau loss cost classification which applies to the job or location where the operation is performed."[67] This requires Wilkinson to classify each employee on a job site the highest risk classification applicable to his or her role on the site.

Specifically, the Rating Manual defines the "roofing" classification as applying to

> [S]pecialist contractors performing any type of roofing, roofing repair or reroofing job utilizing any type of roofing material, including but not necessarily limited to hot tar, shingles, slate, tile or rubber on any type of roof.... [This classification is] [a]lso applicable to all personnel working

---

[65]    Trial Ex. Binder at EX00042–EX00043.

[66]    Trial Ex. Binder at EX00095.

[67]    *Id.*

-18-

on a roofing job (e.g. ground personnel passing materials to personnel on the roof and picking up debris and personnel on the roof). Further applicable to the waterproofing or insulation of roofs and the pressure washing of roofs.[68]

This "roofing" classification also includes "[r]oof decking and related carpentry work," and "installation of sheet metal products (e.g. fascia, gutters, downspouts) by a roofing contractor that is part of a roofing job."[69] Classifying an employee under the "sheet metal" classification is only proper if that employee works solely at a "separately staffed and local sheet metal fabrication shop."[70]

At trial, Wilkinson was unable to identify any job function (other than those few clerical or administrative positions at the company) that was unrelated to roofing during the policy period.[71] Yet, during the policy period, Wilkinson's initial payroll estimate was that there would only be one employee who was involved in roofing work in any way. The Court finds by a preponderance of the evidence that Wilkinson breached its obligations under the Policy.

The Rating Manual allows LM to classify all workers as the highest classification for the type of work Wilkinson did if Wilkinson could not produce the

---

[68]     Trial Ex. Binder at EX00102.

[69]     *Id.*

[70]     *Id.*

[71]     Tr. at 181.

-19-

separate individual payroll records that were required for construction jobs. That is what LM did here.

LM, through an endorsement, reclassified all of Wilkinson's Delaware construction employees as "roofers." Because roofing is riskier than sheet metal or general carpentry, workers' compensation insurance premiums for roofers are higher. After the reclassification, the premium due to LM rose from the initial estimate of $29,912 (based on one "roofer") to $73,325. To date, Wilkinson has paid LM $39,385; that leaves a balance of $33,940.[72] The Court finds by a preponderance of the evidence that this balance remains due to LM.

### C. WILKINSON OWES ADDITIONAL PREMIUM AFTER PROPER RECLASSIFICATION OF "SALESPERSONS" AS ROOFERS.

LM says that it is owed $14,905 in premium for Delaware roofers misclassified as salespersons by Wilkinson. LM says it is also owed an additional $9,161 for Maryland roofers misclassified as salespersons by Wilkinson.

The Rating Manual defines "salespersons" as "employees exclusively engaged in sales or collection work away from the employer's premises or who are engaged in such work for any portion of their time and devote the balance of their time to clerical office duties."[73] A Job Sites Sheet, illustrating where employees

---

[72] Tr. at 68.

[73] Trial Ex. Binder at EX00091.

spent their day, shows alleged Delaware salesperson[74] Victor B. working at a roofing job in Maryland.[75] The Job Sites Sheet also shows alleged Maryland salesperson[76] Joseph C. working at a roofing job site in Maryland.[77]

Mr. Bleacher testified that Wilkinson had only one roofer on the payroll in 2010.[78] In 2011, Wilkinson classified that same roofer as a "salesperson."[79] In 2010, while applying for LM insurance coverage, Mr. Bleacher signed an application for workers' compensation estimating no payroll for salespersons.[80] Mr. Bleacher also testified that Wilkinson's salespersons "managed the project."[81] Yet, this does not fall within the Rating Manual's definition of salespersons: "employees exclusively engaged in sales or collection work away from the employer's premises."[82]

---

[74]    Trial Ex. Binder at EX00318.

[75]    Trial Ex. Binder at EX00302.

[76]    Trial Ex. Binder at EX00330.

[77]    *Id.*

[78]    Tr. at 188.

[79]    Trial Ex. Binder at EX00208.

[80]    Trial Ex. Binder at EX00592.

[81]    Tr. at 175.

[82]    Trial Ex. Binder at EX00091.

The Court finds by a preponderance of the evidence that Wilkinson's Delaware employees reported by Wilkinson as salespersons were properly re-classified as roofers under the Rating Manual. And, as explained further below, Wilkinson's employees doing work in Maryland were covered by LM's Delaware Policy, no matter the existence of Wilkinson's Maryland insurer. Therefore, LM is entitled to: (1) the $14,905 in damages for the Delaware salespersons reclassified as roofers; and (2) the $9,161 for the employees conducting Maryland work.

### D. WILKINSON OWES PREMIUM FOR ITS EMPLOYEES' OUT-OF-STATE WORK.

LM's auditor testified that as a "courtesy" to the insured, insurance companies do not double-charge premiums for employees based in one state that work in other state(s).[83] Instead, those companies will cover a claim if it is brought, and then subrogate from the company that receives a premium for that employee's work. LM says that with the inconsistencies, and sometimes fabrication, of the records it received, it has no good-faith basis to believe that Wilkinson had adequate out-of-state workers' compensation insurance coverage for employees traveling to Wilkinson's out-of-state jobs.

---

[83] Tr. at 92.

Notwithstanding, the custom described governs neither LM's actual coverage obligation nor Wilkinson's actual premium obligation. Delaware statutory law does. Nineteen *Del. C.* § 2303 provides that:

> If an employee, while working outside the territorial limits of this State, suffers an injury . . . such employee shall be entitled to the benefits provided by this chapter, provided that at the time of such injury: (1) [t]he employee's employment is principally localized in this State; or (2) [t]he employee is working under a contract of hire made in this State in employment not principally localized in any state; or (3) [t]he employee is working under a contract of hire made in this State in employment principally localized in another state whose workers' compensation law is not applicable to the employee's employer; or (4) [t]he employee is working under a contract of hire made in this State for employment outside the United States and Canada.[84]

Further, the statute provides that "the payment or award of benefits under the workers' compensation law of another state . . . shall not be a bar to a claim for benefits under this chapter."[85] Under Delaware law and the Policy, LM was at-risk

---

[84] DEL. CODE ANN. tit. 19, § 2303(a) (2010).

[85] *Id.* at § 2303(b).

for any potential benefits claimed by Wilkinson employees principally localized in Delaware,[86] regardless of the location of their worksite.[87]

Even if LM would normally bind itself to follow industry custom and "courtesy," that practice would not apply in this case. Why? Because Wilkinson had no roofing coverage for its out-of-state worksites. Wilkinson has produced evidence that it possessed some workers' compensation insurance coverage in Maryland, Pennsylvania, and New Jersey. Mr. Bleacher claimed that Wilkinson had proper insurance in those states both during LM's Policy period and in the years prior. Wilkinson paid $17,457 for coverage in Maryland, but the record shows a $0 estimated annual premium for roofing.[88] Wilkinson paid $14,845 for coverage in Pennsylvania, but the record again shows a $0 estimated annual premium for roofing.[89] Finally, Wilkinson paid $9,151 for coverage in New Jersey, with $7,614

---

[86]    *See id.* at § 2303(d)(4) ("A person's employment is principally localized in this or another state when: . . . A person's employer has a place of business in this or such other state and the person regularly works at or from such place of business").

[87]    "[The] premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of . . . all other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy." Trial Ex. Binder at EX00043. Part One of the Policy provides that "[LM is] directly and primarily liable to any person entitled to the benefits payable by this insurance." *Id.* at EX00039.

[88]    Trial Ex. Binder at EX00567.

[89]    Trial Ex. Binder at EX00564.

in estimated annual premium for roofing—but this New Jersey coverage was obtained only after Wilkinson completed a large roofing job.[90]

Despite showing $0 in roofing coverage in Maryland, Wilkinson does adduce evidence that it had coverage from IWIF in the case of employee Jose O.'s injury. Mr. O. injured himself when he fell from a roof in Maryland on March 2, 2011; Wilkinson was then under LM's coverage.[91] Wilkinson initially reported the claim to LM, as it could. And LM paid benefits under the claim. That's because Mr. O. appeared by all accounts to be a Delaware employee working on a Maryland job.[92] In turn, by law he could have sought benefits in either state via either policy. Wilkinson later reported the injury to its insurance carrier in Maryland, which also paid out on the claim.[93] LM maintained that Wilkinson's submission of the Mr. O. claim to LM was proper and so it did not attempt to subrogate that claim.[94] While this seems to contradict LM's auditor's testimony that industry practice is not to have an insured double-covered (and, then double-charged), that is not dispositive of the premium owed. The clear Policy language is.

---

[90]    Trial Ex. Binder at EX00572; *supra* note 47.

[91]    Trial Ex. Binder at EX00566.

[92]    *Id.*

[93]    Trial Ex. Binder at EX00487.

[94]    Trial Ex. Binder at EX00405–06.

After reviewing the evidence produced, the Court finds by a preponderance of the evidence that Wilkinson breached its obligations under the Policy by failing to provide coverage for its out-of-state employees. As such, LM is entitled to the additional premiums that Wilkinson owes LM for its coverage of Wilkinson's out-of-state employees during the policy period.

## IV. CONCLUSION

This Court finds, by a preponderance of the evidence, that Wilkinson breached its contract with LM. Wilkinson did not properly document what each of its employees did at its construction sites. Wilkinson falsified records when questioned about each employee's role in each job. And it caused LM to charge too low a premium for the risk that LM actually covered for jobs completed in Delaware during the Policy period.

Thus, Wilkinson owes LM $33,940 – the balance due when LM reclassified all of Wilkinson's job site employees as "roofing." Wilkinson additionally owes premium for its Delaware and Maryland employees who were fraudulently classified by Wilkinson as salespersons and are now properly reclassified by LM as roofers. Finally, Wilkinson failed to have proper out-of-state coverage and put LM at risk for coverage of Wilkinson employees at its out-of-state sites.

In sum, Wilkinson owes an additional premium total of $96,339. And a judgment in this amount shall be entered against Wilkinson and for LM.

**IT IS SO ORDERED.**

Paul R. Wallace, Judge

Original to Prothonotary
cc: All counsel via File and Serve