# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KNIGHT BROADBAND LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N21C-07-076 EMD CCLD |
| | ) | |
| JEFFRY KNIGHT and JEFFRY | ) | |
| KNIGHT, INC. (d/b/a KNIGHT | ) | |
| ENTERPRISES), | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| JEFFRY KNIGHT, INC., | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KNIGHT BROADBAND LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FULL CIRCLE FIBER PARTNERS | ) | |
| and MILL POINT CAPITAL, LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

Submitted: March 1, 2022[1]
Decided: June 2, 2022

*Upon Plaintiff/Counterclaim Defendant and Third-Party Defendant's Motion to Dismiss Amended Counterclaim*
**GRANTED in part and DENIED in part**

Kevin R. Shannon, Esquire, Christopher N. Kelly, Esquire, Daniel M. Rusk, IV, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, William C. O'Neil, Esquire, Gretchen V. Scavo, Esquire, A. Matthew Durkin, Esquire, Winston & Strawn LLP, Chicago, Illinois. *Attorneys for Plaintiff and Counterclaim Defendant Knight Broadband LLC and Third-Party Defendants Full Circle Fiber Partners and Mill Point Capital, LLC.*

---

[1] D.I. No. 38.

Melissa N. Donimirski, Esquire, Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware, Timothy W. Weber, Esquire, Joseph P. Kenny, Weber, Crabb & Wein, P.A., St. Petersburg, Florida. *Attorneys for Defendants and Counterclaim Plaintiff Jeffry Knight, Inc.*

**DAVIS, J.**

## I.     INTRODUCTION

This is a breach of contract and fraud action assigned to the Court's Complex Commercial Litigation Division. Plaintiff Knight Broadband LLC ("Buyer" or "Broadband") purchased company assets from Defendants Jeffrey Knight[2] and Jeffry Knight, Inc. (d/b/a Knight Enterprises) ("Seller" or "Knight Enterprises"). Knight Enterprises sold the assets to Broadband through the Purchase Agreement (as defined below). The claims and counterclaims in this civil action arise in connection with the Purchase Agreement.

Broadband initiated this civil action on July 12, 2021.[3] Broadband filed an amended complaint (the "Amended Complaint") on September 15, 2021.[4] The Amended Complaint asserts fraud and breach of contract claims against Mr. Knight and Knight Enterprises. Knight Enterprises answered and asserted counterclaims and third-party claims, alleging fraud ("Counterclaim I") by Buyer and Third-Party Defendant Mill Point Capital, LLC ("Mill Point").[5] In addition, Knight Enterprises brought a breach of contract claim ("Counterclaim II") against Broadband and Third-Party Defendant Full Circle Fiber Partners LLC ("Full Circle Fiber") (Mill Point and Full Circle Fiber are collectively referred to as the "Third-Party Defendants").[6]

On October 29, 2021, Broadband and Third-Party Defendants moved (the "Motion")[7] to dismiss Counterclaim I and, in part, Counterclaim II. The Motion seeks to dismiss under two

---

[2] Under a stipulation and order, the Court dismissed Mr. Knight from this civil action. D.I. No. 19.
[3] D.I. No. 1.
[4] D.I. No. 16.
[5] D.I. No. 20.
[6] D.I. No. 20.
[7] D.I. No. 21.

distinct arguments. First, the Motion argues that the Court should dismiss Counterclaim I for failure to state a claim and failure to plead fraud with the requisite particularity. Second, the Motion seeks "to dismiss [Knight Enterprises'] breach of contract claim for lack of subject matter jurisdiction to the extent the claim is based on allegations that Buyer failed to make working capital and/or earn-out payments under the Asset Contribution and Purchase Agreement among Jeffry Knight, Inc., Jeffry Knight, Full Circle Fiber [ ] and [] Broadband[.]"[8] The Motion contends the Court lacks subject matter jurisdiction because those disputes are controlled by an alternative resolution process agreed to in the Purchase Agreement.[9] Knight Enterprises opposed the Motion.[10] The Court held a hearing on the Motion on February 10, 2022 and took the Motion under advisement.[11]

For the reasons set forth below, the Court **GRANTS** the Motion with respect to Counterclaim I. The Court **DENIES** the Motion as to Counterclaim II and the purchase price/contingent consideration claim but **GRANTS** the Motion as to Counterclaim II and the working capital provision issue.

## II. RELEVANT FACTS

### A. THE PARTIES

This dispute arises out of the sale of assets in a company doing business as Knight Enterprises (now Broadband).[12] Broadband provides broadband installation and construction services.[13] Full Circle Fiber is a holding company that owns Broadband.[14] "Mill Point is a

---

[8] Counterclaim Defendant and Third-Party Defendants' Opening Brief in Support of Motion to Dismiss the Amended Counterclaims (hereinafter "Mot.") at 1.
[9] *Id.*
[10] D.I. No. 27.
[11] D.I. No. 36.
[12] Am. Compl. ¶ 2.
[13] *Id.*
[14] Am. Counterclaim ¶ 1.

3

private equity sponsor that serves as the general partner of a fund that owns Full Circle [Fiber]."[15]

## B. PRE-AGREEMENT NEGOTIATIONS

Michael Duran was the President and Ben Rogers was a Vice President of Mill Point during those times material to this dispute.[16] Knight Enterprises alleges that in December 2019, "Duran, on behalf of Mill Point, made a preemptive bid to purchase the stock of Knight Enterprises from Jeffry D. Knight for $52 million."[17] As part of the sale process, Mr. Duran purportedly made representations to Mr. Knight including: (i) "that Mill Point was a private equity firm that engaged executive partners with deep industry expertise to provide additive value to targeted investments while partnering with the existing management team;"[18] (ii) "key management of the company would stay in place and the executive partners would build upon the legacy of Knight Enterprises by leveraging industry relationships and adding managerial expertise;"[19] and (iii) "Mill Point's financial backing would allow it to use Knight Enterprises as a platform company into which it would consolidate multiple contemplated acquisitions and that Knight would remain as a consultant for the purpose of assisting in these acquisitions, earning substantial additional revenue for doing so."[20]

Before the sale, Knight Enterprises alleges that "between December of 2019 and March 2020 both [Mr.] Rogers and [Mr.] Duran, while acting on behalf of Mill Point, repeatedly assured [Mr.] Knight, a reluctant seller, that Mill Point intended to grow the business by performing targeted acquisitions, that [Mr.] Knight would assist in these acquisitions, and that

---

[15] Mot. at 4.
[16] Am. Counterclaim. ¶¶ 2, 3.
[17] *Id.* ¶ 4.
[18] *Id.* ¶ 5.
[19] *Id.* ¶ 6.
[20] *Id.* ¶ 7.

4

[Mr. Knight] would continue to earn substantial revenue for doing so."[21]  Knight Enterprises also contends that "[d]uring this time, [Mr.] Rogers and [Mr.] Duran also told [Mr.] Knight that he would receive stock in Full Circle Fiber, the holding company for entity that would eventually acquire the assets of Knight Enterprises, which would substantially increase in value as Mill Point completed targeted acquisitions.  [Mr.] Rogers and [Mr.] Duran also told [Mr.] Knight he would receive $ 5 million earn out payments for 2020 and 2021."[22]

## C. THE PURCHASE AGREEMENT

Knight Enterprises, Mr. Knight, Full Circle Fiber,[23] and Broadband signed a purchase agreement on April 10, 2020 (the "Purchase Agreement").[24]  "The Purchase Agreement contains a provision that governs the purchase price and contingent consideration (or earn-outs), including how the parties are to resolve related disputes."[25]  Under the Purchase Agreement "Seller received $27 million in cash at closing, a promissory note in the amount of $5 million that matures in 5 years, and the potential for additional earn-out consideration that is subject to certain Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") targets being met."[26]  Knight Enterprises contends that in addition Mr. Knight "would receive a minority stock interest in Full Circle Fiber[.]"[27]

Purchase Agreement Section 1.05(c) details the process to determine whether the earn-out targets for a particular period had been met and what the resulting earn-out compensation

---

[21] *Id.* ¶ 9.
[22] *Id.* ¶ 10.
[23] As a signatory to the Purchase Agreement, Full Circle is jointly and severally liable for any breach thereof by Broadband. *See* Compl., Ex. A, Asset Contribution and Purchase Agreement § 6.03.  The Court will hereafter refer to the Asset Contribution and Purchase Agreement as the "Purchase Agreement."
[24] *See* Purchase Agreement.
[25] Mot. at 4.
[26] *Id.* (citing Purchase Agreement § 1.05).
[27] Am. Counterclaim ¶ 12 (citing Purchase Agreement § 1.05 and Appendix A).

5

would be.[28]  Purchase Agreement Section 1.05(c)(i) controls contingent consideration/earn-out

provisions and provides:

> Within thirty (30) days following the end of the First Calculation Period and the Section Calculation Period, as applicable, Buyer shall prepare in good faith and deliver to the Seller a written statement (each, a **"Contingent Consideration Calculation Statement"**) setting forth in reasonable detail its determination of EBITDA for the applicable Contingent Consideration Measurement Period and its calculation of the resulting Contingent Consideration Payment for such Contingent Consideration Measurement Period (the **"Contingent Consideration Calculation"**), together with the financial statements and notes thereto, if appliable. Seller will have thirty (30) days after receipt of a Contingent Consideration Calculation Statement (each, a **"Contingent Consideration Review Period"**) to review . . . [29]

Purchase Agreement Section 1.05(c)(i) further details the process when Knight Enterprises is

entitled to inspect Broadband's books and records:

> During the Contingent Consideration Review Period, Seller . . . shall have the right to inspect Buyer's books and records during normal business hours at Buyer's offices, upon reasonable prior notice and solely for purposes reasonably related to the determinations of EBITDA for the applicable Contingent Consideration Measurement Period and the resulting Contingent Consideration Payment. [30]

Purchase Agreement Section 1.05(c)(i) also provides a process if there is a dispute:

> Prior to the expiration of the Contingent Consideration Review Period, the Seller may object to the Contingent Consideration Calculation set forth in a Contingent Consideration Calculation Statement for a Contingent Consideration Measurement Period by delivering a written notice of objection (a **"Contingent Consideration Calculation Objection Notice"**) to Buyer. The Contingent Consideration Calculation Objection Notice shall specify the items in the applicable Contingent Consideration Calculation disputed by the Seller and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. If Seller fails to deliver a Contingent Consideration Calculation Objection Notice to Buyer prior to the expiration of a Contingent Consideration Review Period, then the Contingent Consideration Calculation set forth in the applicable Contingent Consideration Calculation Statement shall be final and binding on the parties (absent fraud or intentional misconduct). If Seller timely delivers a Contingent Consideration Calculation Objection Notice, Buyer and Seller shall negotiate in good faith to resolve the disputed items and agree upon the resulting amount of the EBITDA for

---

[28] Purchase Agreement § 1.05(c).
[29] Purchase Agreement § 1.05(c)(i).
[30] *Id.*

the applicable Contingent Consideration Measurement Period and the Contingent Consideration Payment for the applicable Contingent Consideration Measurement Period. **If Buyer and the Seller are unable to reach agreement within thirty (30) days after such a Contingent Consideration Calculation Objection Notice has been given, all unresolved disputed items shall be promptly referred to the Accounting Expert for resolution in accordance with the dispute mechanics set forth in Section 1.06(d).**[31]

Purchase Agreement Section 1.05(c)(i) sets out the payment process after final determination of the Contingent Consideration Payment:

> Upon the final determination of the Contingent Consideration Payment, if any, pursuant to the terms of this Section 1.05(c)(i), Buyer shall have five (5) Business Days to pay Seller the amount of such Contingent Consideration Payment, after which interest shall accrue on the amount of such Contingent Consideration Payment at the rate of eight and a half percent (8.5%). For the avoidance of doubt, the accrual of interest on the amount of the Contingent Consideration Payment shall be in addition to and not a limitation on Seller's remedies against Buyer for Buyer's failure to pay the Contingent Consideration Payment when due.[32]

Purchase Agreement Section 1.06 establishes the process for determining the working capital adjustment and related dispute resolution.[33]  Purchase Agreement Section 1.06(c) proves how to prepare the Closing Statement and requires that:

> Within fifty (50) days after the Closing Date, Buyer shall prepare, or cause to be prepared, and deliver to the Seller a written statement (the "**Closing Statement**") that shall include a balance sheet of Seller as of the Effective Time prepared in accordance with the Accounting Principles and a good-faith calculation of the following and a statement of the Net Adjustment Amount:
>
> > (i) the Closing Transaction Expenses;
> > (ii) the Closing Indebtedness;
> > (iii) the Closing Cash on Hand; and
> > (iv) the Closing Working Capital.[34]

Purchase Agreement Section 1.06(d)(i) controls the Review Period for the required dispute resolution process and states:

---

[31] *Id.* (emphasis added).
[32] *Id.*
[33] *See* Purchase Agreement § 1.06(d).
[34] Purchase Agreement § 1.06(c).

During the thirty (30) day period following Buyer's delivery of the Closing Statement to Seller (the **"Review Period"**), Buyer shall provide Seller reasonable access to the relevant books and records and employees of Buyer for the purpose of facilitating Seller's review of the Closing Statement. The Closing Statement shall become final and binding at the end of the last day of the Review Period (absent fraud), unless prior to the end of the Review Period, Seller delivers to Buyer a written notice of disagreement (a **"Notice of Disagreement"**) specifying the nature and amount of any and all items in dispute as to the amounts set forth in the Closing Statement. Seller shall be deemed to have agreed with all items and amounts in the Closing Statement not specifically referenced in a Notice of Disagreement provided prior to the end of the Review Period.[35]

Purchase Agreement Section 1.06(d)(ii) defines the Resolution Period and the Accounting

Expert. The subsection provides:

During the thirty (30) day period following delivery of a Notice of Disagreement by Seller to Buyer (the **"Resolution Period"**), such parties in good faith shall seek to resolve in writing any differences that they may have with respect to the computation of the amounts as specified therein. . . . If Seller and Buyer have not resolved all such differences by the end of the Resolution Period, Seller and Buyer shall submit, in writing, such differences to the Accounting Expert. The **"Accounting Expert"** shall be Grant Thornton LLP, who is an expert in accounting for businesses that are similar to the Business and not an arbitrator, or, in the event not available or not a Neutral Accounting Firm, a Neutral Accounting Firm selected by mutual agreement of Buyer and Seller; provided, however, that: (i) if, within fifteen (15) days after the end of the Resolution Period, such parties are unable to agree on a Neutral Accounting Firm to act as the Accounting Expert, then each party shall select a Neutral Accounting Firm and such firms together shall select the Neutral Accounting Firm to act as the Accounting Expert, and (ii) if any party does not select a Neutral Accounting Firm within ten (10) days of written demand therefor by the other party, then the Neutral Accounting Firm selected by the other party shall act as the Accounting Expert. A **"Neutral Accounting Firm"** means an independent accounting firm of nationally recognized standing that is not at the time it is to be engaged hereunder rendering services to any party, or any Affiliate of either, and has not done so within the three (3) year-period prior thereto.[36]

Purchase Agreement Section 1.06(d)(iii) details how the Accounting Expert will resolve

disputes:

The parties shall arrange for the Accounting Expert to agree in its engagement letter to act in accordance with this Section 1.06(d)(iii). Each party shall present a brief to the Accounting Expert (which brief shall also be concurrently provided to the

---

[35] Purchase Agreement § 1.06(d)(i).
[36] Purchase Agreement § 1.06(d)(ii).

other party) within thirty (30) days of the appointment of the Accounting Expert detailing such party's views as to the correct nature and amount of each item remaining in dispute from the Notice of Disagreement (and for the avoidance of doubt, no party may introduce a dispute to the Accounting Expert that was not originally set forth on the Notice of Disagreement). Within thirty (30) days of receipt of the brief, the receiving party may present a responsive brief to the Accounting Expert (which responsive brief shall also be concurrently provided to the other party). Each party may make an oral presentation to the Accounting Expert (in which case, such presenting party shall notify the other party of such presentation, and the other party shall have the right to be present (and speak) at such presentation), within forty-five (45) days of the appointment of the Accounting Expert. The Accounting Expert shall have the opportunity to present written questions to either party, a copy of which shall be provided to the other party. The Accounting Expert shall consider only those items and amounts in Seller's and Buyer's respective calculations that are identified as being items and amounts to which Seller and Buyer have been unable to agree. In resolving any disputed item, the Accounting Expert may not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party. In resolving any disputed item, the Accounting Expert shall look solely to the definitions set forth in this Agreement, including the definitions of Closing Working Capital, Cash on Hand, Transaction Expenses and Indebtedness. **The Accounting Expert shall make a written determination within sixty (60) days of its appointment as to each such disputed item, which determination shall be final and binding on the parties for all purposes hereunder absent manifest error.** The fees and expenses of the Accounting Expert and of any enforcement of the determination thereof, shall be borne by Seller, on the one hand, and Buyer, on the other hand, in inverse proportion as they may prevail on the matters resolved by the Accounting Expert, which proportionate allocation shall be calculated on an aggregate basis based on the relative dollar values of the amounts in dispute and shall be determined by the Accounting Expert at the time the determination of such firm is rendered on the merits of the matters submitted.[37]

Purchase Agreement Section 7.05 sets out an integration provision which provides in part:

**Entire Agreement.** This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.[38]

---

[37] Purchase Agreement § 1.06(d)(iii) (emphasis added).
[38] Purchase Agreement § 7.05.

Knight Enterprises alleges that it entered into the Purchase Agreement "based upon the knowingly false representations of [Buyer], [Mr.] Duran, and [Mr.] Rogers concerning their intentions to retain the management, carry through on targeted acquisitions, and, importantly, pay Knight Enterprises the purchase price agreed to for the Business -- $52 million."[39] Further, Knight Enterprises asserts that "[i]mmediately after closing, [Broadband] refused to carry out the targeting acquisition of Kablelink, and forced out the existing management team, despite repeated assurances to the contrary."[40]

Knight Enterprises states that Broadband delivered approximately $27 million at closing in accordance with the Purchase Agreement.[41] Knight Enterprises then claims that Broadband materially breached the Purchase Agreement as to Working Capital Adjustments by providing fraudulent and false financial statements to Knight Enterprises while simultaneously refusing to provide access to Broadband's financials.[42] Knight Enterprises also asserts that Broadband materially breached the Purchase Agreement as to first earn-out payments by failing to: (i) deliver any financial statements, and (ii) remit payment within the designated timeframe.[43]

### D. CURRENT LITIGATION

Broadband filed a complaint (the "Complaint") against Knight Enterprises and its controlling member, Mr. Knight, alleging claims for fraud and breach of the Purchase Agreement on July 12, 2021.[44] On August 16, 2021, Broadband answered the Complaint and asserted two counterclaims.[45] Mr. Knight moved to dismiss the Complaint on August 16, 2021.[46] On

---

[39] Am. Counterclaim ¶ 11.
[40] Opp. at 2.
[41] *Id.* at 3.
[42] *Id.*
[43] *Id.*
[44] D.I. No. 1.
[45] D.I. No. 9.
[46] D.I. No. 10.

10

September 15, 2021, Broadband and Third-Party Defendants filed a Motion to Dismiss Counterclaim[47] and the Amended Complaint.[48] On September 24, 2021, by stipulation and order, the parties stipulated to a partial dismissal as to Mr. Knight.[49]

On October 15, 2021, Knight Enterprises answered the Amended Complaint and asserted two Amended Counterclaims: (i) Counterclaim I: fraud against Broadband and Mill Point based on alleged pre-contractual and contractual misrepresentations that induced Seller into entering the Purchase Agreement for the sale of the business; and (ii) Counterclaim II: breach of contract against Broadband and Full Circle based on Buyer's alleged failure to pay monies owed under the Purchase Agreement, failure to participate in good faith in the process for disputing payment was due, making unauthorized public announcement, and refusing access to the Books and Records of the business.[50]

On October 29, 2021, Broadband filed the Motion and asked the Court to dismiss Counterclaim I and a portion of Counterclaim II.[51] Knight Enterprises filed its Answering Brief in Opposition to the Motion (the "Opposition") on December 6, 2021.[52] On December 20, 2021, Broadband and Third-Party Defendants filed a Reply Brief in Support of the Motion.[53] The Court held a hearing on February 10, 2022.[54] At the conclusion of the hearing, the Court took the Motion under advisement.[55]

---

[47] D.I. No. 15.
[48] D.I. No. 16.
[49] D.I. Nos. 17, 19.
[50] D.I. No. 20.
[51] D.I. No. 21.
[52] D.I. No. 27.
[53] D.I. No. 30.
[54] D.I. No. 36.
[55] D.I. No. 36.

### III.    PARTIES' CONTENTIONS

#### A.    THE MOTION

Broadband asks that the Court to dismiss Counterclaim I and dismiss that part of Counterclaim II based on the purchase price/contingent consideration and working capital provisions of the Purchase Agreement.  Broadband contends that Counterclaim I should be dismissed for failure to state a claim under Civil Rule 12(b)(6), and for failure to plead fraud with the requisite particularity under Civil Rule 9(b).  Specifically, Broadband argues that Knight Enterprises fails to allege to all elements of a fraud claim—a false statement and knowledge or belief that the representation was false.[56]  Further, Broadband contends that "to the extent Seller's fraud claim is based upon [Buyer's] alleged failure to perform its payment obligations under the Purchase Agreement," that claim is a replication of the breach of contract claim and those claims seek the same damages and therefore should be dismissed.[57]

Broadband argues that the Court should dismiss Counterclaim II, to the extent it is based on a purported breach of the earn-out or working capital provisions, because the Court lacks jurisdiction to decide those issues.  Broadband contends that these issues, under the Purchase Agreement, must be resolved by the Accounting Expert and not the Court.

Broadband claims that dismissal should be with prejudice because Knight Enterprises has already had the opportunity to amend the Counterclaims.

#### B.    THE OPPOSITION

Knight Enterprises argues that the Motion should be denied because the fraud allegations are pled with the requisite particularity and are separate and distinct from the breach of contract claim.  Further, Knight Enterprises contends that Count II does not concern a dispute regarding

---

[56] Opp. at 21.
[57] Opp. at 23.

12

Purchase Agreement calculations. Instead, Knight Enterprises claims that Count II rests on Broadband's failure to satisfy contractual obligations and these are issues beyond the Accounting Expert's authority.

## IV. STANDARD OF REVIEW

### A. CIVIL RULE 12(B)(6) FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Upon a motion to dismiss, the Court (i) accepts all well-pled factual allegations as true, (ii) accepts even vague allegations as well-pled if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[58] However, the court must "ignore conclusory allegations that lack specific supporting factual allegations."[59]

In considering a motion to dismiss under Civil Rule 12(b)(6), the court generally may not consider matters outside the complaint.[60] However, documents that are integral to or incorporated by reference in the complaint may be considered.[61] "If . . . matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."[62]

### B. Civil Rule 9(B) PLEADING FRAUD WITH PARTICULARITY

---

[58] *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad.*, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[59] *Ramunno v. Crawley*, 705 A.2d 1029, 1034 (Del. 1998).
[60] Super. Ct. Civ. R. 12(b).
[61] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995).
[62] Super. Ct. Civ. R. 12(b).

Under Civil Rule 9(b), a party must plead fraud and negligence with particularity.[63] The purpose of [Rule 9(b)] is to apprise the adversary of the acts or omissions by which it is alleged that a duty has been violated.[64] To plead fraud or negligence with the particularity required by Rule 9(b), a party must include the "time, place, contents of the alleged fraud or negligence, as well as the individual accused of committing the fraud" or negligence.[65]

### C. CIVIL RULE 12(B)(1) LACK OF SUBJECT MATTER JURISDICTION

The Court will dismiss an action under Civil Rule 12(b)(1) if the record, which may include evidence outside the pleadings, demonstrates that the Court does not have subject matter jurisdiction over the plaintiff's claims.[66] The plaintiff bears the burden of establishing subject matter jurisdiction, and "where the plaintiff's jurisdictional allegations are challenged through the introduction of material extrinsic to the pleadings, [the plaintiff] must support those allegations with competent proof."[67]

## V. DISCUSSION

### A. COUNTERCLAIM I

Knight Enterprises alleges two theories of fraud in Count I of the Counterclaims. Seller claims that: (i) Mr. Duran and Mr. Rogers, Mill Point representatives, made pre-contractual misrepresentations about plans for the business to fraudulently induce Mr. Knight to sell the company;[68] (ii) Broadband made "promises of future performance" regarding payments "in the Purchase Agreement without the present intention of performing them."[69]

---

[63] Super. Ct. Civ. R. 9(b).
[64] *Mancino v. Webb*, 274 A.2d 711, 713 (Del. Super. 1971).
[65] *See TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *6 (Del. Super. Sept. 25, 2015) (quoting *Universal Cap. Mgmt., Inc. v. Micco World, Inc,* 2012 WL 1313598, at *2 (Del. Super. Feb. 1, 2012).
[66] *See, e.g., Pitts v. City of Wilm.*, 2009 WL 1204492, at *5 (Del. Ch. Apr. 27, 2009).
[67] *Id.*
[68] Am. Counterclaim ¶¶ 35-40. The Amended Counterclaim contains two separate paragraphs labeled 35, the allegations are contained in the second paragraph labeled 35.
[69] *Id.* ¶ 36.

Broadband argues that Counterclaim II should be dismissed for two reasons. "First, [Knight Enterprises] fails to sufficiently plead the elements of fraud or plead them with the requisite particularity as to both the pre-contractual statements and the promise to pay in the Purchase Agreement."[70] "Second, [Knight Enterprises'] fraud claim based upon [Broadband's] promise to pay in the Purchase Agreement is entirely duplicative of, and indistinguishable from, its claim for breach of contract."[71] Broadband also notes that the damages sought in Counterclaim I are identical to those sought in Counterclaim II.[72] Broadband contends that Knight Enterprises fails to plead the elements of fraud with the requisite particularity because Knight Enterprises fails to allege: (i) a false statement; and (ii) knowledge that Broadband knew or believed that the representation was false.

Knight Enterprises counters and argues that Counterclaim I pleads all elements of fraud with sufficient particularity.[73] In addition, Knight Enterprises submits that the details alleged are sufficient to apprise the counterclaim-defendants of the basis for the fraud claim under Delaware law.[74]

> To plead a claim of fraud, plaintiff must show:
>
> 1) a false representation, usually one of fact . . .; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance.[75]

---

[70] Mot. at 13.

[71] *Id.*

[72] *Id.*

[73] Opp. at 5.

[74] *Id.*

[75] *Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008) (quoting *Gaffin v. Teledyne, Inc.,* 611 A.2d 467, 472 (Del.1992)).

Under Civil Rule 9(b), a plaintiff must plead fraud and negligence with particularity.[76] The plaintiff must include the "time, place, contents of the alleged fraud or negligence, as well as the individual accused of committing the fraud" or negligence.[77] "Essentially, ... the plaintiff must allege circumstances sufficient to fairly apprise the defendant of the basis for the claim."[78]

*Fortis Advisors LLC v. Dialog Semiconductor PLC*[79] provides additional guidance when a fraud claim is based on promises of future performance. The plaintiff in *Fortis* alleged that unidentified employees of the defendant made four materially false statements during the parties 3.5-month negotiation period which induced the plaintiff to enter into an agreement.[80] Specifically, the plaintiff contended that the defendant made four materially false statements during the negotiations: (i) defendant would keep the existing sales force; (ii) only reduce the sales force if defendant's sales force could service existing customers; (iii) increase investments, add new products to accelerate growth; and (iv) use defendant's existing relationships to increase sales after the acquisition.[81] The plaintiff then contended that the defendant "had no intention to keep those promises a the time they were made" and, as evidence, pointed to the fact that the defendant reduced staffing and support for existing products once the transaction closed.[82]

In dismissing the fraud claim, the Court of Chancery opined that alleging misrepresentations were made during negotiations without specificity "is the functional equivalent to providing no time parameter at all because the misrepresentations logically could not have occurred during any other period of time[,]" leaving defendant "to guess when

---

[76] Super. Ct. Civ. R. 9(b).
[77] *See TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *6 (Del. Super. Sept. 25, 2015) (quoting *Universal Cap. Mgmt., Inc. v. Micco World, Inc.*, 2012 WL 1413598, at *2 (Del. Super. Feb. 1, 2012)).
[78] *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003).
[79] 2015 WL 401371, at *8 (Del. Ch. Jan. 30, 2015).
[80] *Id.* at *6.
[81] *Id.*
[82] *Id.*

[plaintiff] contends that it allegedly made any of the four false statements attributed to it."[83]

When the alleged misrepresentations were for future performance, the Court of Chancery

explains that:

> Pleading when the alleged misrepresentations occurred is especially important where, as here, the alleged promises are of future performance. When a fraud claim is premised on promises of future performance, a plaintiff must demonstrate that the defendant had no intention of keeping its promises at the time they were made. To defend against such assertions, a defendant logically must be apprised when the alleged statements were made in order to counter the assertion that it did not intend to keep its promise at that time.[84]

To survive dismissal, the Court of Chancery held that there must be meaningful allegations

regarding the representations, and where, when or by what means the representations were

made.[85]

The main difference between *Fortis* and the present case is that in *Fortis* there was a

failure to identify who specifically was alleged to have made the misrepresentation. Knight

Enterprises have alleged that Mr. Duran and Mr. Rogers made the misrepresentations. Despite

knowing who made the alleged misrepresentations, Knight Enterprises fails to provide specific

timeframes. In addition, Knight Enterprises does not allege where or by what means the alleged

misrepresentations occurred. As discussed below, given the absence of these facts taken

together, Knight Enterprises does not allege circumstances sufficient to apprise Broadband of the

basis of the claim.[86] Accordingly, the Court will grant the Motion as to Counterclaim I.

---

[83] *Id.* at *7.
[84] *Id.*
[85] *Id.* at *7-8.
[86] *See H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003).

### i. *Knight Enterprises does not allege an actionable false representation of existing fact.*

With respect to the pre-contractual representations, Broadband contends that the Counterclaim I's allegations "consist of a handful of generic statements about Mill Point's qualifications and plans for the business if it were to be acquired."[87] Broadband argues that even accepting the allegations as true, "none of these statements are false statements of *existing fact*, . . . [i]nstead, they are forward-looking statements about general post-acquisition plans and aspirations. . ."[88] Broadband contends that forward-looking statements do not constitute fraud under Delaware law absent factual allegations that they were knowingly false or made in bad faith and Knight Enterprises does not adequately plead either situation.[89] "The only allegations in the Amended Counterclaim to suggest that Mill Point knew the representations were false when made are entirely conclusory and, even then, cite only to post-closing events."[90]

Knight Enterprises provides that the alleged representations made were not aspirational but instead were "a promise to a partner with existing management where the names and identities of management personnel are known and identified and carried over, but then intentionally driven out."[91] Further, Knight Enterprises argues that "[t]here is nothing aspirational about an affirmative statement to utilize Mr. Knight as a consultant in acquisition deals."[92]

The first element of fraud, a "false representation" can take several forms, including: an "overt misrepresentation (*i.e.*, a lie), a deliberate concealment of material facts, or . . . silence in

---

[87] Mot. at 15.
[88] *Id.*
[89] *Id.* at 16.
[90] *Id.*
[91] Opp. at 7.
[92] *Id.*

18

the face of a duty to speak."[93]  Knight Enterprises alleges overt misrepresentations.  The pre-

contractual statements in dispute are as follows:

- Mr. Duran allegedly represented to Mr. Knight that "Mill Point was a private equity firm that engaged executive partners with deep industry expertise to provide additive value to targeted investments while partnering with the existing management team."[94]

- Mr. Duran allegedly represented that "key management of the company would stay in place [post-acquisition] and the executive partners would build upon the legacy of Knight Enterprises by leveraging industry relationships and adding managerial expertise."[95]

- Mr. Duran allegedly represented that "Mill Point's financial backing would allow it to use Knight Enterprises as a platform company into which it would consolidate multiple contemplated acquisitions and that Knight would remain as a consultant for the purpose of assisting in these acquisitions, earning substantial additional revenue for doing so."[96]

- Mr. Duran and Mr. Rogers allegedly told Mr. Knight "that Mill Point intended to grow the business by performing targeted acquisitions, that [Mr.] Knight would assist in these acquisitions, and that he would continue to earn substantial revenue for doing so."[97]

- Mr. Rogers and Mr. Duran also allegedly told Mr. Knight that he would receive stock in Full Circle Fiber, which would substantially increase in value as Mill Point completed targeted acquisitions, and that he would receive $5 million in earn out payments for 2020 and 2021.[98]

The Court will look to Knight Enterprises' actual allegations made in support of Counterclaim I.

Knight Enterprises states that paragraphs 8, 10, 13, and 14 support Counterclaim I.  These

allegations are:

---

[93] *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at *26 (Del. Ch. Apr. 3, 2020).
[94] Am. Counterclaim ¶ 5. "[A] company's optimistic statements praising its own 'skills, experience, and resources' are 'mere puffery and cannot form the basis for a fraud claim.'" *Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at *8 (Del. Ch. July 20, 2010) (citing cases where courts found representations of expertise and unique resources to be mere non-actionable puffery). The alleged statements in this paragraph are the kind of "vague statements that a commercial party routinely makes during a deal-making courtship." *Id.* Therefore, the alleged statements about Mill Point's experience are not actionable.
[95] Am. Counterclaim ¶ 6.
[96] *Id.* ¶ 7.
[97] *Id.* ¶ 9.
[98] *Id.* ¶ 10.

8. Duran knew these representations to be false at the time they were made, because Mill Point never intended to carry out any targeted acquisitions or to allow Knight to have any meaningful involvement in the company after the sale.

10. . . . However at the time these statements were made, Rogers, Duran and Mill Point had no intention of ever following through on their assurances to Knight. There were never going to be any targeted acquisitions, no increasing stock value, and no earn out payments.

13. At the time Duran and Rogers caused Mill Point and Knight Broadband to enter into the Purchase Agreement, Mill Point and Knight Broadband had no intention of ever making any earn out payments and instead intended to acquire Knight Enterprises by leveraging its own assets and not paying Knight Enterprises any more monies. In addition, Mill Point and Knight Broadband intended to defraud Knight Enterprises out of its working capital and those portions of the sales proceeds that were held back for escrows.

14. Immediately after the closing of this transaction, Knight Broadband refused to acquire Kablelink, making clear that it had no intention of acquiring the targeted companies. In addition, it had no intention of consulting with Mr. Knight for the purpose of pursuing acquisitions and frustrated all efforts to do so. Finally, in addition to pushing out the existing management Knight Broadband demonstrated that it had every intention to cheat Knight out of the sales proceeds that were promised for the Business.[99]

"Statements of opinion and predictions about the future usually are not actionable as fraud under Delaware law."[100] This is particularly "true in the context of statements regarding management's expectations for a company's future performance."[101] However, "a promise of future conduct can be actionable in fraud" if the plaintiff "plead[s] specific facts that lead to a reasonable inference that the promisor had no intention of performing at the time the promise was made."[102] "Forward-looking statements of opinion are actionable as fraudulent only if they were known to be false when made or were made with a lack of good faith."[103]

---

[99] *Id.* ¶¶ 8, 10, 13, 14.

[100] *Mooney v. E.I. du Pont de Nemours and Co.*, 2017 WL 5713308, at *6 (Del. Super. Nov. 28, 2017) (citing *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 209 (Del. Ch. 2006)).

[101] *Id.*

[102] *See Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *12 (Del. Ch. June 6, 2018) (internal quotation marks and emphasis omitted).

[103] *Mooney v. E.I. du Pont de Nemours and Co.*, 2017 WL 5713308, at *6 (Del. Super. Nov. 28, 2017)

Here, the Court finds that Knight Enterprises has failed to allege specific facts that make the allegations actionable. Knight Enterprises relies upon Paragraph 8 to stand as factual support for what happens in Paragraphs 10, 13 and 14. However, Knight Enterprises does not sufficiently plead contemporaneous facts supporting an inference that Mr. Duran or Mr. Rogers knew their statements were false when made or lacked a good faith belief in their truth. Rather, Knight Enterprises cites to events arising after the statements were made. Specifically, Knight Enterprises argues the subsequent failure to acquire Kablelink, consult with Mr. Knight post-acquisition, and "pushing out the existing management" is proof that Mr. Duran and Mr. Rogers earlier statements were false. However, these allegations fail to demonstrate that Mill Point representatives had no intention to follow through with the pre-acquisition representations when they were made.

Knight Enterprises arguments are made entirely of conclusory statements and circular arguments which cite only to post-acquisition events. For instance, Knight Enterprises contends that Mr. Duran and Mr. Rogers allegedly told Mr. Knight "that Mill Point intended to grow the business by performing targeted acquisitions, that [Mr.] Knight would assist in these acquisitions, and that he would continue to earn substantial revenue for doing so."[104] However these statements were purportedly false because ". . . at the time these statements were made, Rogers, Duran and Mill Point had no intention of ever following through on their assurances to Knight. There were never going to be any targeted acquisitions, no increasing stock value, and no earn out payments."[105] Knight Enterprises cannot allege that Mr. Rogers and Mr. Duran fraudulently misrepresented Mill Point's plans regarding acquisitions and Mr. Knights role by

---

[104] Am. Counterclaim ¶ 9.
[105] *Id.* ¶ 10.

21

arguing that the statements were false without any facts that the statements were knowingly false when made or were made in bad faith.

### ii. Time, Place, Contents

Even if the Court were to find that Knight Enterprises alleged actionable false representations of existing fact, the Court also finds that Counterclaim I fails to satisfy the heightened pleading requirements of Civil Rule 9(b).

Broadband argues that the alleged pre-contractual statements at issue are not actionable because Counterclaim I does not allege the date or time of the alleged misrepresentations,[106] or how or where the statements were made.[107] Broadband, therefore, contends that even if the Court were to find that the alleged statements are actionable, they still fail because they are not pled with particularity as to time, place, and contents.[108]

Knight Enterprises states that "a failure to describe exactly where (business office, city park, etc.) a conversation occurred and how (via phone, in person) a conversation occurred does not in and of itself warrant dismissal unless the failure to provide these details is combined with a failure to state who made the representations and when they were made[.]"[109] More specifically, Knight Enterprises argues that Counterclaim I identifies the persons making the false representations as Mr. Duran and Mr. Rogers and alleges the dates of the misrepresentations to be between December 2019 and March 2020.[110] Knight Enterprises argues these details are more than sufficient to put Broadband on notice of the circumstances of the alleged fraud and the basis.

---

[106] Noting that Sellers refer to a four-month period before the Purchase Agreement was signed.
[107] Mot. at 18.
[108] *See* Reply at 6-7.
[109] Opp. at 8.
[110] *Id.* (citing Am. Counterclaim ¶¶ 5-7, 9).

The plaintiff must include the "time, place, contents of the alleged fraud or negligence, as well as the individual accused of committing the fraud" or negligence.[111] "Essentially, ... the plaintiff must allege circumstances sufficient to apprise the defendant of the basis of the claim."[112] Otherwise, the fraud claim fails to rely on any meaningful allegations as to when the alleged misrepresentations were made and their impact.[113]

Despite knowing who made the alleged misrepresentations, Knight Enterprises fails to provide specific timeframes. In addition, Knight Enterprises does not allege where or by what means the alleged misrepresentations occurred. Given the absence of these facts taken together, Knight Enterprises does not allege circumstances sufficient to apprise Broadband of the basis of the claim.[114]

### iii.    Knowledge

Broadband argues that Knight Enterprises fails to allege knowledge because the "Amended Counterclaim is devoid of any contemporaneous factual allegations that Mill Point or Buyer knew that the alleged statements at issue were false at the time they were made."[115] Further, Broadband claims that "[a]lthough knowledge and intent may typically be averred generally under Rule 9(b), that is not the case where, as here, a fraud claim is based upon promises of future intent."[116]

Knight Enterprises argues that the other elements of fraud are sufficiently pled because Mr. Duran and Mr. Rogers knew the representations were false when made.[117] Knight

---

[111] *See TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *6 (Del. Super. Sept. 25, 2015) (quoting *Universal Capital Mgmt., Inc. v. Micco World, Inc.*, 2012 WL 1413598, at *2 (Del. Super. Feb. 1, 2012)).
[112] *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003).
[113] *Fortis*, 2015 WL 401371, at *7.
[114] *See H–M Wexford LLC,* 832 A.2d at 145.
[115] Mot. at 20-21.
[116] Reply at 9.
[117] Opp. at 9.

Enterprises relies on the caselaw finding that "'state of mind' including knowledge and intent, 'may be averred generally'" and the pleader "need only point to factual allegations making it reasonably conceivable that" the party charged with fraud "knew the statement was false."[118] Knight Enterprises argues that it is reasonably conceivable that Mr. Rogers and Mr. Duran knew their statements were false when made and the Amended Counterclaim alleges multiple factual allegations to demonstrate this point.[119] To demonstrate knowledge, Knight Enterprises notes that Mill Point, immediately after closing, refused to acquire another company "Kablelink" which "is evidence that Mill Point never intended to carry out the targeted acquisitions."[120] Knight Enterprises also claims that Mill Point "'decimated the ranks of existing management,' created a hostile work environment, forced managers to take pay cuts while bringing on new senior personnel, and forced 'the CEO, COO, CFO, regional managers, corporate personnel, and others to leave the company' because Mill Point never intended to keep the existing management team in place."[121]

Knight Enterprises argues that intent to induce, or state of mind, may be averred generally. Knight Enterprises aver that "the fraudulent inducement was monetarily driven" and was "to induce Buyer to enter into a business deal that would deprive it of the full value he bargained for and to swingle it out of its successful business."[122] Knight Enterprises argue that the other elements of fraud, justifiable reliance and damages exist here.[123]

---

[118] *Id.* (citing *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015)).
[119] *Id.* The factual allegations Seller argues supports this contention are contained in paragraphs 8, 10, and 13. Am. Counterclaim ¶¶ 8, 10, 13.
[120] Opp. at 10.
[121] *Id.* (citing Am. Counterclaim ¶ 27).
[122] *Id.* at 11.
[123] *Id.*

"Malice, intent, knowledge and other condition of mind of a person may be averred generally."[124] "At the motion to dismiss stage, a plaintiff 'need only point to factual allegations making it reasonably conceivable that the defendants charged with fraud knew the statement was false.'"[125] Essentially, the plaintiff must allege fraud "with detail sufficient to apprise the defendant of the basis for the claim."[126]

The Court finds that Knight Enterprises' pleading lacks the specific factual allegations required to support a reasonable inference that Mr. Duran and Mr. Rogers never intended to comply with their alleged promises and that, in fact, their statements were a lie when made.[127] The allegations supporting the assertions in the Amended Counterclaim are conclusory. For example: "Duran knew these representations to be false at the time they were made, because Mill Point never intended to carry out any targeted acquisitions to or allow Knight to have any meaningful involvement in the company after the sale."[128] As noted in *Fortis*, when the allegations involve future performance, Knight Enterprises needs to be more factual specific as to its allegations regarding fraud.

### iv.    *Bootstrapping Doctrine*

Broadband argues that "to the extent the fraud claim is based on [Buyer's] alleged failure to perform its obligations under the Purchase Agreement, it is duplicative of, and subsumed by, its contract claim."[129] Specifically, Broadband contends that "Seller attempts to bootstrap the fraud claim onto the contract claim by alleging that Mill Point had 'no intention of ever making

---

[124] Super. Ct. Civ. R. 9(b).
[125] *In re Bracket Holding Corp. Litigation*, 2017 WL 3283169, at *10 (Del. Super. Jul. 31, 2017) (citing *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 61 (Del. Ch. 2015)).
[126] *Abry Partners V., L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).
[127] *See CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *22 (Del. Ch. Apr. 21, 2015).
[128] Am. Counterclaim ¶ 8.
[129] Mot. at 21.

25

any earn out payments and instead intended to acquire Knight Enterprises by leveraging its own assets and not paying Enterprises any more monies [than the cash at closing].'"[130] Broadband states that this allegation is insufficient to convert a breach of contract claim into a fraud claim because it merely asserts the same facts and seeks the same damages.[131]

Knight Enterprises argues that the breach of contract claim is entirely separate from the fraud claim and "such claims do not seek the same damages just because Counterclaim I states that the amount of damages for each cause of action should be determined at trial."[132] Knight Enterprises contends that the damages are not identical but instead have yet to be determined.

Knight Enterprises argues that "[t]he fraud that occurred prior to entering into the agreement (false statements to induct Knight Enterprises to sell) is entirely separate from the fraud that occurred in connection with the breach of contract claim (falsification of financial documents in relation to payouts under the Purchase Agreement), and the resulting damages are not the same."[133] To demonstrate this, Knight Enterprises argues that "damages under the fraud claim involve losses related to the consulting services and value of the stock, whereas losses under the breach of contract action involve the Contingent Consideration Tranche 1 payment and Escrow money."[134]

Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's action.[135] The damages allegations, however, may not simply rehash the damages allegedly caused by

---

[130] *Id.* at 21-22 (citing Am. Counterclaim ¶ 13).
[131] *Id.* at 23-24.
[132] Opp. at 12.
[133] *Id.*
[134] *Id.*
[135] *Novipax Holdings LLC v. Sealed Air Corp.*, 2017 WL 5713307, at *14 (Del. Super. Nov. 28, 2017) (citing *ITW Glob. Invest. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.,* 2015 WL 3970908, at *5 (Del. Super. June 24, 2015)).

26

breach of contract.[136] Moreover, plaintiff cannot "bootstrap a claim of breach of contract into a claim for fraud by alleging that a contracting party never intended to perform its obligations."[137] In other words, plaintiff cannot adequately state a fraud claim merely by adding the term "fraudulently induced" to a claim for breach of contract.[138]

The Court finds that Counterclaim I is not a contract claim "disguised" as a fraud claim. Counterclaim I seeks recovery based on alleged misrepresentations relating to future earnings for work in connection with additional acquisitions and stock in Full Circle Fiber, and enticing Mr. Knight into selling due to these misrepresentations. Counterclaim I, therefore, is not duplicative of, and subsumed by a contract claim. The problem with Counterclaim I is not bootstrapping but whether Counterclaim I is a viable fraud claim and was it sufficiently pled.

## B. COUNTERCLAIM II

Broadband argues that the "Seller's breach of contract claim fails to the extent it is based on a purported breach of the earn-out or working capital provisions because the court lacks jurisdiction to decide those issues."[139] Broadband relies upon the Purchase Agreement and notes that the parties unambiguously agreed in the Purchase Agreement that an independent third-party Accounting Expert would resolve disputes relating to earn-out/contingent consideration and working capital issues and Seller's claim for breach of contract based on disputes relating to those issues must be dismissed for lack of jurisdiction.[140]

Knight Enterprises argues that the breach of contract claim is beyond the scope of the Accounting Expert's authority.[141] Knight Enterprises contends that Counterclaim II does not

---

[136] *Id.*
[137] *Id.* (quoting *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010)).
[138] *Novipax Hldg.*, 2017 WL 5713307, at *14.
[139] Mot. at 24.
[140] *Id.*
[141] Opp. at 13.

27

turn on a dispute over computations, but rather a failure to comply with contractual obligations.

Knight Enterprises argues that a designated expert, such as the Accounting Expert in this case, is

not an arbitrator, and therefore does not have the authority to resolve legal disputes.[142] Knight

Enterprises contends that the breach of contract disputes are legal in nature:

> Seller's Amended Counterclaim alleges that when Buyer failed to provide the Contingent Consideration Calculation Statement by required deadline, the full Tranche 1 payment became due and payable at that time, so Buyer breached when it failed to make the payment as required. This is not a computation issue for the Accounting Expert to decide, but one of contractual interpretation for the Court. Similarly, Buyer breached its obligations under the working capital provisions when it intentionally provided false and fraudulent and false financial statements in bad faith, and then refused to provide Seller access to Buyer's financials as it is required to do under the Purchase Agreement.[143]

Purchase Agreement Section 1.05(c) details the process by which the parties were to

determine whether the earn-out targets for a particular period had been met and what the

resulting earn-out compensation would be.[144] The first sentence of Section 1.05(c)(1) states:

> Within thirty (30) days following the end of the First Calculation Period and the Section Calculation Period, as applicable, Buyer shall prepare in good faith and deliver to the Seller a written statement (each, a **"Contingent Consideration Calculation Statement"**) setting forth in reasonable detail its determination of EBITDA for the applicable Contingent Consideration Measurement Period and its calculation of the resulting Contingent Consideration Payment for such Contingent Consideration Measurement Period (the **"Contingent Consideration Calculation"**), together with the financial statements and notes thereto, if appliable.[145]

After the Contingent Consideration Calculation Statement is prepared and delivered to

Knight Enterprises a series of steps occur which includes Knight Enterprises having the

opportunity to inspect Broadband's books and records, and then if Knight Enterprises has any

---

[142] *Id.*
[143] *Id.* at 14.
[144] Purchase Agreement § 1.05(c).
[145] Purchase Agreement § 1.05(c)(i).

objections, delivering a written objection notice.[146] If the parties are unable to agree on their

dispute within 30 days after Knight Enterprises delivers its objection notice, "all unresolved

disputed items shall be promptly referred to the Accounting Expert[147] for resolution in

accordance with the dispute mechanics set forth in Section 1.06(d)."[148]

> Section 1.06(d)(ii) details who the Accounting Expert shall be and provides in part:
> (ii) During the thirty (30) day period following delivery of a Notice of
> Disagreement by Seller to Buyer (the **"Resolution Period"**), such parties in good
> faith shall seek to resolve in writing any differences that they may have with respect
> to the computation of the amounts as specified therein. . . . If Seller and Buyer have
> not resolved all such differences by the end of the Resolution Period, Seller and
> Buyer shall submit, in writing, such differences to the Accounting Expert. The
> **"Accounting Expert"** shall be Grant Thornton LLP, who is an expert in accounting
> for businesses that are similar to the Business and not an arbitrator[.] . . .[149]

Purchase Agreement Section 1.06(d)(iii) goes on to describe the process by which the

Accounting Expert will resolve disputes. At the end of the process "[t]he Accounting Expert

shall make a written determination within sixty (60) days of its appointment as to each such

disputed item, which determination shall be final and binding on the parties for all purposes

hereunder absent manifest error." [150]

This Court and the Court of Chancery have discussed the matter of an Accounting

Expert's role at length in a series of recent cases.[151] The Court of Chancery has found that an

---

[146] *See id.*

[147] The "Accounting Expert" is defined in Section 1.06(d) as Grant Thornton LLP or, in the event not available or not a Neutral Accounting Firm, a Neutral Accounting Firm selected by mutual agreement of Buyer and Seller, subject to certain exceptions. A Neutral Accounting Firm is defined, in turn, as an "independent accounting firm of nationally recognized standing that is not at the time it is to be engaged hereunder rendering services to any party, or any Affiliate of either, and has not done so within the three (3) year-period prior thereto." (Purchase Agreement § 1.06(d)(ii)).

[148] Mot. at 5 (citing Purchase Agreement § 1.05(c)).

[149] Purchase Agreement § 1.06(d)(ii).

[150] *Id.* (emphasis added).

[151] *See LDC Parent, LLC v. Essential Utilities, Inc.*, 2021 WL 1884847 (Del. Super. Apr. 28, 2021); *Stone v. Nationstar Mort. LLC*, 2020 WL 4037337 (Del. Ch. July 6, 2020); *Ray Beyond Corp. v. Trimaran Fund Mgmt, L.L.C.*, 2019 WL 366614 (Del. Ch. Jan. 29, 2019). *See also Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912 (Del. 2017) (discussing the role of an independent auditor as an expert and not an arbitrator when the scope of the review was limited to a discrete set of issues).

Independent Accountant is an expert and not an arbitrator even when the language of the Purchase Agreement does not expressly state so.[152] Here, the Purchase Agreement makes clear that the Accounting Expert is not an arbitrator. [153]

The Accounting Expert's role is limited to resolving disputes once they are submitted using the processes detailed in Purchase Agreement Section 1.06(d). The Accounting Expert is not a mediator or arbitrator divesting this Court of jurisdiction.[154] Although the parties could give an expert the authority to interpret the contract, they did not here, and instead the Court must interpret the contract.

When an Accounting Expert is an expert and not an arbitrator the Court of Chancery has provided guidance noting that:

> There is no general principle either that the expert always has exclusive jurisdiction to decide the meaning of the terms of the contract, or that the expert never has exclusive jurisdiction to do so. Rather, in each case it is necessary to examine the contract itself in order to decide what the parties intended should be a matter for the exclusive decision of the expert.[155]

The Amended Counterclaim alleges that "Knight Broadband did not furnish a Contingent Consideration Calculation Statement on or before January 30, 2021."[156] As such "[i]n mid-February of 2021, Knight Enterprises advised Knight Broadband that it deemed the full amount due and would expect payment in accordance with the timelines provided in the Purchase Agreement."[157] Knight Enterprises' claim as it relates to earn-out provisions is that Broadband

---

[152] *Stone v. Nationstar Mort. LLC*, 2020 WL 4037337, *8 (Del. Ch. July 6, 2020).
[153] Purchase Agreement § 1.06(d)(ii).
[154] *See Ray Beyond Corp.* 2019 WL 366614, at *16-17 ("Expert determination and arbitration provisions confer fundamentally different scopes of authority to third-party decision makers. A typical expert determination provision limits the decision maker's authority to deciding a specific factual dispute within the decision maker's expertise. In contrast, the scope of authority conferred on an arbitrator is analogous to the authority conferred on a judicial officer.").
[155] *Penton Bus. Media Holdings LLC v. Informa PLC*, 252 A.3d 445, 465 (Del. Ch. 2018) (quotations omitted).
[156] Am. Counterclaim ¶ 21.
[157] *Id.* ¶ 22.

never began the process to engage the Accounting Expert in a dispute resolution calculation. Based on the pleadings and the Purchase Agreement, the Court finds that Knight Enterprises' raises an issue of law and not a computation.

The analysis is less clear for the working capital provisions. In Knight Enterprises' Opposition, it argues that as with the earn-out claims, the claims regarding breach of working capital provisions also fall outside the scope of the Accounting Expert's authority.[158] To support this, Seller's point to Amended Counterclaim paragraphs 15 through 18 which state in part:

> . . . 50 days after the Closing Date, Buyer was to prepare and furnish to [Seller] a good-faith calculation of the actual working capital delivered for purposes of adjusting any differences in the working capital and, if necessary, remitting the excess working capital to Seller.[159]

Knight Enterprises then contends that Broadband submitted financial statements that were false and fraudulent which forced Knight Enterprises to hire lawyers and accountants to dispute those claims.[160]

Unlike the earn-out provisions, the Court finds that the claims related to the working capital payments seem to be entirely premised on the argument that Broadband submitted a false and fraudulent Closing Statement, not that Broadband failed to submit documents as required by the Purchase Agreement. Knight Enterprises' claim as it relates to working payment seems to be entirely premised on an accounting issue (the correctness of numbers) and it is unclear how that dispute implicates an issue of law for the Court to determine.

The Court therefore denies the Motion as it relates to Counterclaim II to the extent that claim is based on the purchase price/contingent consideration and grants the Motion as it relates

---

[158] Opp. at 16.
[159] Am. Counterclaim ¶ 15.
[160] *Id.* ¶ 16-18.

31

to Counterclaim II to the extent that claim is based on the working capital provision of the

Purchase Agreement.

## VI.     CONCLUSION

For the reasons stated above, the Court **GRANTS** the Motion as to Counterclaim I.  In

addition, the Court **DENIES**, in part, and **GRANTS**, in part, the Motion as to Counterclaim II.

June 2, 2022
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc: File&ServeXpress